877 So.2d 89 (2004)
Michael BONIN, et al.
v.
FERRELLGAS, INC., et al.
No. 2003-C-3024.
Supreme Court of Louisiana.
July 2, 2004.
*90 Louis C. LaCour, Jr., Robert Markle, Adams & Reese, New Orleans; Steven G. Emerson, Thomas H. Davis, Stinson, Morrison, Hecker; John E. McElligottr, Jr., Davidson, Meaux, Sonnier, McElligott & Swift, Lafayette; Larry A. Stewart, Stafford, Stewart & Potter, Alexandria; David R. Frohn, Frohn & Thibodeaux, Lake Charles, Counsel for Applicant.
Jennifer A. Jones, Jennings B. Jones, III, Patrick K. Hebert, Jones Law Firm, Cameron; Philip G. Hunter, Hunter & Morton, Alexandria; John W. deGravelles, deGravelles, Palmintier, Holthaus & Fruge, Baton Rouge; Daniel K. Wall, Marcantel, Marcantel, Wall & Pfeiffer, Jennings; Allen L. Smith, Jr., Plauche, Smith & Nieset, Lake Charles; Peter B. Derouen, Michael C. McMullen, Michael J. Remondet, Jr., Jeansonne & Remondet, Lafayette; Michael L. Hyman, Edgar D. Gankendorff, Provosty, Sadler, Delaunay, Fiorenza & Sobel, Alexandria; Scott H. Fruge, Baton Rouge, Bruce D. Beach, Nora M. Stelly, Allen & Gooch, Lafayette, Counsel for Defendant.
VICTORY, J.
We granted this writ to determine whether the court of appeal misapplied the *91 manifest error/clearly wrong standard of review in reversing a jury verdict in favor of the defendant, Empiregas, Inc. of Lake Charles ("Empiregas"). After a review of the record and the applicable law, we reverse the judgment of the court of appeal and reinstate the trial court judgment in favor of Empiregas.

FACTS AND PROCEDURAL HISTORY
In August of 1995, six young adults staying in a rental cabin, Cabin R-6, at the "Richard Cabins" in Holly Beach, Cameron Parish, Louisiana, were severely burned when their cabin caught fire. The fire department's investigation discovered an open and uncapped propane gas line located along the cabin's south wall.[1] The fire was caused by propane gas that had leaked from the open, uncapped gas line valve. Defendant Lawrence Lanclos ("Lanclos") owned and operated the Richard Cabins, comprising ten units, which he purchased in 1986. Propane gas for all of the cabins was originally provided by a single, red propane tank. Beginning in July of 1986, shortly after Lanclos acquired the property, Empiregas began servicing and providing propane gas to the cabins. Empiregas made ten deliveries of propane gas to the Richard Cabins, beginning on July 16, 1986 and ending on December 11, 1987. During this time period, Empiregas did not inspect the entire propane gas system at the cabins as required by law.[2] However, the gas line in Cabin R-6 was neither open nor uncapped during this time period as a space heater was attached to the outlet.
Lanclos had no records of receiving propane gas service from anyone after December of 1987 until a delivery was made by Ferrellgas, Inc. ("Ferrellgas") on May 12, 1989. Ferrellgas remained the sole servicing dealer for more than six years, including the time period when the fire occurred. Ferrellgas's last delivery of *92 propane gas to the cabins was one week before the accident. When Ferrellgas began servicing the account, it also failed to inspect the entire propane gas system at the cabins.
In addition, when the 1995 accident occurred, propane was being supplied by Ferrellgas to Cabin R-6 from a silver propane tank, which Lanclos himself had installed five months earlier. Lanclos had determined that the red tank was no longer safe, so he bought and installed the silver tank. This silver tank replaced the red propane tank that supplied gas to the cabins at the time Ferrellgas began servicing the cabins in 1989. Ferrellgas knew that the swap-out of the tank required an inspection of the entire system, but it failed to perform the inspection.
The record reflects that had Ferrellgas conducted the required inspections, it would have discovered the uncapped line in Cabin R-6. Lanclos testified that sometime in 1988, he removed the space heater that was attached to the outlet but failed to cap it. This occurred after Empiregas had ceased servicing the account, but before Ferrellgas began servicing the account.
The victims of the fire, Michael Bonin, Brent Benoit, William John "Billy" Britt, John Perez, Jeffrey Kebodeaux, and Angela Thibodeaux, along with their respective parents and/or children ("plaintiffs"), all filed suit for their injuries against Lanclos and Ferrellgas. These suits were later consolidated. On June 27, 1996, plaintiffs and Ferrellgas entered into a "Mary Carter" settlement for $18,000,000.00. The terms of the agreement required plaintiffs to sue Empiregas and to pay Ferrellgas, its insurer, and its counsel 56% of the first $18,000,000.00 recovered from Empiregas. Ferrellgas then aligned itself with plaintiffs and agreed to help them prosecute their claims against Empiregas.
Empiregas moved for summary judgment on the grounds that the risk that led to the accident, the uncapped valve in Cabin R-6, did not exist when Empiregas provided propane service to the cabin. Empiregas established this fact through several depositions given by Lanclos. Plaintiffs then produced an affidavit from Lanclos stating that after reviewing matters with plaintiffs' counsel, he wished to recant his testimony. The trial court granted Empiregas's motion for summary judgment. The Third Circuit reversed on the grounds that the trial court had based its decision on Lanclos's testimony. Thibodeaux v. Ferrellgas, Inc., 98-0862 (La.App. 3 Cir. 1/6/99), 741 So.2d 34. The court found that the "apparent contradictions and Lanclos's explanations ... are arguable and best left to the jury." Id. at 42.
Trial on the merits went forward in the 9th JDC on November 6-16, 2001.[3] The jury returned a verdict in favor of Empiregas, answering "No" to Jury Interrogatory # 1, which asked "Was Empire Gas, Inc., Empire Gas of Lake Charles, Inc., its agents, servants or employees negligent, and, if so, was such negligence a proximate *93 cause of [each plaintiff's] burn injuries?"[4] The trial judge entered judgment in accordance with the verdict and also granted motions for directed verdict dismissing Lawrence Lanclos.
The Third Circuit reversed, finding no "reasonable basis upon which the jury could have reached the conclusion that Empire was relieved of all liability for the injuries Plaintiffs sustained." Bonin v. Ferrellgas, Inc., 02-1031 (La.App. 3 Cir. 8/6/03), 855 So.2d 781, 799. The court of appeal found that Empiregas breached its duty to inspect the entire Richard Cabins propane gas system before initially servicing the account, and that this duty extended to those who rented the cabins even after Empiregas had ceased servicing that account. Id. at 795-96. Then, recognizing that even if Empiregas was negligent, it would be excused from liability "if an intervening cause superseded the original negligence and, alone, produced the injury," the court of appeal found that "the entire cause-in-fact inquiry turns on Mr. Lanclos' knowledge of whether he needed to cap the valves." Id. at 797. The court of appeal dismissed the argument that Empiregas's failure to inspect the cabins was not a substantial factor contributing to the fire, even though at the time of Empiregas's service, the line in Cabin R-6 was not uncapped due to the existence of a space heater. Instead, the court of appeal reasoned that if Empiregas had performed an inspection of the entire system, it would have discovered uncapped gas lines in other cabins and should have informed Lanclos of these defects, refusing to service the system until he corrected the defects by capping the lines, which would also have had the effect of notifying Lanclos that lines had to be capped, which would have prevented Lanclos from leaving the line in Cabin R-6 uncapped several years later. Id. at 798. The court of appeal found that the testimony of Lanclos was "uncontradicted" and failed to show that he knew a line with a valve had to be plugged or capped. Id. at 799. Thus, the court of appeal apportioned 65% of the fault to Ferrellgas and 35% of the fault to Empiregas, and fixed damages at more than $21,000,000.00, resulting in the imposition of more than $8,000,000.00 in damages against Empiregas.
We granted Empiregas's writ application to consider whether the Third Circuit misapplied the manifest error/clearly *94 wrong standard of review. Bonin v. Ferrellgas, Inc., 03-3024 (La.2/13/04), 866 So.2d 805.

DISCUSSION
Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis. The determination of liability under the duty/risk analysis usually requires proof of five separate elements: (1) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606, 611; Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225, 1230 (citing David W. Robertson, et al., Cases and Materials on Torts, 83-84 (1989); Fowler v. Roberts, 556 So.2d 1 (La.1989) (on original hearing)).
Empiregas argues that the court of appeal erred by reversing the jury's findings on the issue of causation. Cause-in-fact is generally a "but for" inquiry, which tests whether the accident would or would not have occurred but for the defendant's substandard conduct. Id. However, where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. In this case, more than one party's conduct allegedly caused the fire, i.e., Ferrellgas, Empiregas, and Lanclos. In considering the substantial factor test, this Court has stated that cause-in-fact clearly exists when the plaintiff's harm would not have occurred absent the specific defendant's conduct. Perkins, supra at 612 (citing Graves v. Page, 96-2201 (La.11/7/97), 703 So. 566, 570). This Court has considered "whether each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred `but for' each individual cause." Perkins, supra at 612 (citing Graves, supra). Also considered is "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm." Id. (Quoting LeJeune v. Allstate Ins. Co., 365 So.2d 471, 475 (La.1978)). Whether the defendant's conduct was a substantial factor in bringing about the harm, and thus, a cause-in-fact of the injuries, is a factual question to be determined by the fact finder. Perkins, supra at 612; Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305, 1310.
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Id. Although we have spelled out the appropriate standard of review under the manifest error standard on numerous occasions, it bears repeating, because the court of appeal in this case improperly applied this standard. As this Court has recently stated, the manifest error/clearly wrong standard is "now well-established doctrine." Henderson v. Nissan Motor Corp., 03-0606 (La.2/6/04), 869 So.2d 62.
Under the manifest error standard, in order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) *95 further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221. In sum:
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. (Emphasis added.)
Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973); Ambrose, supra at 224 n. 1 (Lemmon, J., concurring).
However, this Court clarified in Ambrose that our purpose in Stobart was not "to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset." Perkins, supra at 613 (citing Ambrose, 639 So.2d at 221). Recognizing that great deference should be accorded to the fact finder, the court of appeal and this Court have a constitutional duty to review facts. Id. To perform its constitutional duty properly, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support. Id. That being said, we reiterate that when two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong.
The key issue in this case is whether the jury's finding, that Empiregas's failure to properly inspect the entire gas system at the Richard Cabins in July of 1986 was not a substantial factor[5] in causing the accident, was clearly wrong based on the evidence or clearly without evidentiary support. The record clearly reflects that had Empiregas inspected all the cabins at that time they would have discovered uncapped lines in some of the cabins, but not Cabin R-6 where the fire occurred, because a space heater was connected to the line during that time. In addition, evidence presented at trial established two other possible causes of this accident: (1) that Lanclos knew that an open valve needed to be capped from his prior experience with such valves at his mother's house and from his experience in installing and connecting an entire new propane gas tank at the Richard Cabins; and (2) that Ferrellgas breached its duty to inspect the propane gas system at the Richard Cabins on at least two subsequent occasions, upon which they would have discovered the uncapped line in Cabin R-6.
While the Third Circuit characterized Lanclos's testimony as "uncontroverted," the record reveals that it was not. The Third Circuit relied on trial testimony which, in their view, "demonstrated that Mr. Lanclos knew that an `open valve' was dangerous and believed that a valve was *96 sufficient to close it and, thus, prevent a leak. However, Empiregas failed to show that he knew a valve had to be capped or plugged." 855 So.2d at 799. However, upon further review of the record, it is clear that there was a conflict in Lanclos's testimony about whether he knew an open line needed to be capped or plugged and that Lanclos's credibility suffered as a result of his cross-examination, where he testified as follows:
Q. Do you remember testifying on numerous occasions, that R-6 had a heater in the cabin when you bought it?
A. Well, I might have said that that day because, you know.
Q. You might have said it?
A. But  but, now, you know, when I go back, I mean, I'm not positive it was in there.
Q. Do you remember giving four depositions in this case?
A. I know. But now, I don't remember if, you know, if  if it was in there, or I put it out there. I can't  I don't remember, you see.
Q. Mr. Lanclos, you remember giving four depositions in this case?
A. Yeah, at that time.
Q. And do you remember you gave your first deposition when Ferrellgas was a defendant?
A. Yes, I remember that, too.
Q. And, then you gave three more depositions after Empire  after Ferrellgas sued, and then after Ferrellgas settled with the plaintiffs, ...
A. Yeah. Uh-huh.
Q .... you gave three more depositions after ...
A. Yeah.
Q.... Ferrellgas sued Empire.
A. Yeah. Uh-huh.
Q. And you remember, in every one of those depositions, we spent a lot of time talking about the space heater in R-6.
A. Yeah, I remember that.
Q. Okay. And do you remember testifying over, and over, and over, again, that when you bought the Richard Cabins, there was a space heater connected to the line in Cabin R-6?
A.I  I  I  I told  I said that, but 
Q. You said it probably thirty times?
A. Maybe more, you know.
Q. During the four different.
A. Yeah.
Q. And are you now going to change that testimony?
A. It's not changed. I don't remember.
Q. Now you don't remember. Have you met with anybody since you gave your last deposition?
A. I just met them a while ago, you know. I ...
Q. Who 
A .... talked with them.
Q. Who did you meet with?
A. With my lawyer and Mr. Jones [plaintiff's counsel].
Q. I see. And did you meet with Mr. Jones today?
A. Yeah,I  I met with him today.
Q. Okay. And Mr. Jones is suing you, is that correct? His clients are suing you?
A. I know. Yeah.
Q. Okay. Did you meet with Mr. Jones about two weeks ago, also?
A.I  I  Mister  my lawyer told me to go meet them where that thing had burned.
Clearly, this testimony put Lanclos's credibility at issue. Lanclos was further cross-examined on his knowledge and experience *97 in working with propane gas systems, including the fact that he himself had disconnected and replaced the red propane tank with the silver propane tank. Lanclos was also cross-examined about installing a gas heater at his mother's house, testifying as follows:
Q. And when you  when you took your mother  the heater out of your mother's house, you put a cap on that gas line, didn't you?
A. No, I didn't put no cap on it.
Q. You didn't?
A. No.
Q. Okay, the gas line was just opened?
A. No, it hada  a valve on it.
Q. Okay. Didn't you testify that the gas line did not have a valve on it, in your depositions?
A. Oh, no. But you can't 
Q. Okay. Do you remember testifying that there was a gas line coming out of the floor at your mother's house?
A. Yeah.
Q. And did I  did  were you asked this question, at Page 40 line 8, "Did it have a valve on it?" And do you remember giving the answer, "I don't think so." Do you remember?
A. Maybe I said it, but  you can't have a line without no something on it. I would have burned the house.
Q. Uh-huh. And what  it didn't have a valve on it, so you put a cap on it. Isn't that the truth?
A. A valve on it. You know, a valve. Something you can open and close.
Q. Do you remember testifying that you put a plug in that line at your mother's house several years before this accident?
A. Well, it could be, you know.
...
Q. Do you remember me asking you this question, "When you took mom's gas stove off the system, did you put a cap on that line so gas wouldn't escape?" "If it had a valve, or whatever you call it, but I took the valve, and I put a plug on it to put the line on it." Do you remember giving me that answer?
A. Well, I'd have to see the valve, you know.
Q. You remember?
A. I'll have to see if  what's on it now, you know.
Q. Okay, do you remember telling ...
A.I 
Q .... us, under oath, you puta  you screwed a plug into the line?
A. Well, I didn't go see, you know. I didn't go see the  I'd have to go see it to  to know exactly what's on it.
Q. Okay. Do you remember ask-me asking you these questions, and you giving this answer? This is on Page 20, counsel, on Line 5:
"Q. What did you just tell me about the plugs, Mr. Lanclos?
A. You can't leave an open line. The gas is going to leak.
Q. And you knew that?
A. Yes.
Q. So you put a plug on it. Is that right?
A. Yeah."
Do you remember giving those answers to those questions?
A. I might have gave you that answer, but ...
Q. Was it true?
A.... I didn't go see the pipe, what's on it, you know.
Q. Where those  were those answers truthful when I asked you those questions? Did you tell me the truth?

*98 A. Well, the truth in my knowledge. But I don't ...
Q. Okay.
A.... I don't know if it's right, or what.
Q. And you put that plug on that line in your mother's house, that gas line, before, years before this accident happened in Holly Beach, didn't you?
A. Yeah. Uh-huh.
Q. Okay. It was before the fire at Holly Beach that you knew that you had to put a plug in an opened line, correct?
A. I didn't know you had to put a plug.
Q. But you did that at your mother's house, correct?
A. Well, I have to go see the house to see if it's there, what it is, if it's a plug, or  or if it's alive. I don't  I don't know.
In light of this testimony, the jurors could have reasonably believed that Lanclos had previously disconnected an appliance and plugged the line at his mother's house, and was not being truthful when he disclaimed any knowledge of the necessity to cap or plug the gas line in Cabin R-6 when he removed the space heater. Lanclos's credibility was clearly at issue, and the jury was in the best position to decide whether Lanclos was telling the truth. See Lasyone v. Kansas City Southern R.R., 00-2628 (La.4/3/01), 786 So.2d 682, 693 (when findings are based on determinations regarding witness credibility, the manifest error/clearly wrong standard demands great deference to trier of fact's findings); Henderson, supra (where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong). As we have stated numerous times, "where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Perkins, supra (numerous citations omitted). The issue is not whether the jury's determination was right or wrong, but whether it was reasonable.
The court of appeal also ignored uncontradicted testimony from Ferrellgas employees that established that Ferrellgas, who supplied gas to the cabins from 1989 up to, and including, the time of the fire, should have inspected the propane system at least twice during that time period, once upon beginning service and again when the new silver propane tank was installed, and that it would have discovered and remedied the uncapped gas line in Cabin R-6 had it conducted either of these required inspections. Whereas there was never an uncapped gas line in Cabin R-6 while Empiregas delivered propane to the cabins, the line in Cabin R-6 was uncapped during the entire time that Ferrellgas serviced them. One employee even testified that it would have been "stupid" for Ferrellgas's employees to rely on an inspection Empiregas might have done years earlier in light of Ferrellgas's independent safety inspection obligations. Finally, unlike Empiregas, whose last delivery of propane gas was nine years before the accident, Ferrellgas delivered propane gas to the cabins as late as one week before the accident.
The evidence presented enabled the jury to reasonably conclude that the accident was not caused by Empiregas as they reasonably could have inferred that Lanclos knew that an open gas line needed to be capped, yet failed to do so. If he already had that knowledge, Empiregas's failure to inspect the system in 1986 and advise Lanclos that open gas lines needed to be capped would not have prevented the accident. Further, the jury could have reasonably concluded based on the evidence presented that Ferrellgas had an independent *99 duty to inspect the entire propane gas system at the Richard Cabins at the time they started providing propane gas in 1989 and again in 1995 when Lanclos installed the new propane gas tank. The jury could have reasonably concluded that, because an inspection at either of these times would have disclosed the uncapped valve in Cabin R-6, Empiregas's breach did not cause the accident.

CONCLUSION
We find that the court of appeal erred in reversing the jury's verdict in favor of Empiregas under the manifest error standard of review. Analyzing this case properly under that standard and considering the testimony of Lanclos and the Ferrellgas employees, we hold that the jury's finding in favor of Empiregas was supported by the evidence and not clearly wrong.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated.
REVERSED; TRIAL COURT JUDGMENT REINSTATED.
NOTES
[1] The gas line had a valve with a short handle which was located at the end of the line.
[2] The jury was instructed as to the regulations applicable to the Louisiana Liquefied Petroleum Gas industry as follows:

1.2 Bonded Dealers, (m): A dealer shall not serve any liquefied petroleum gas system which the dealer knows or should know is not installed pursuant to the Liquefied Petroleum Gas Commission Regulations or is in a dangerous condition. All new installations or reinstallations must be checked by the dealer for tightness of lines, poor workmanship, use of unapproved pipe or appliances or use of poor piping design. All improper installation shall be corrected before the dealer services such installation or reinstallation with fuel for the first time. Any subsequent servicing dealer shall not be responsible for unauthorized changes in or failures of an existing system or connected appliances.
(n): Each dealer shall transmit a notice once a year to each customer stating that liquefied petroleum gas systems are potentially dangerous, that a leak in the system could result in a fire or explosion, and that systems should be inspected periodically.
5.10: Piping, Tubing and Fittings, (a) Piping Material: Piping shall be wrought iron or steel (black or galvanized), brass or copper pipe, or seamless copper, brass or steel.
(f) Cap Outlets: Each outlet, including a valve or cock outlet shall be securely closed gas-tight with a positive threaded plug or a cap if appliance is not to be connected. When an appliance is removed from an outlet, and the outlet is not to be reconnected at that time, it shall be securely closed gas-tight. In no case shall the outlet be closed within tin caps, wooden plugs, corks, etcetera.
5.14: Transfer of Liquids, (g) Must Not Serve Illegal Installations: Bonded dealers must not serve any liquefied petroleum gas containers installed illegally in the state of Louisiana or posted by the Liquefied Petroleum Gas commission. Ignorance will not be accepted as an excuse, as it is the duty of the dealer to investigate before serving any doubtful liquefied gas container.
[3] The week before trial, a purported public service announcement aired on a local television station, showing pictures of the propane tank, a raging house fire, and a woman being loaded into an ambulance. The trial court interrogated potential jurors and determined that the announcement would prejudice jurors against Empiregas, and on Empiregas's motion, ordered that venue be changed to the 9th Judicial District Court for the Parish of Rapides, a parish outside the station's viewing area. The Third Circuit reversed that order, but this Court vacated the Third Circuit's judgment and reinstated the trial court's change of venue order. Thibodeaux v. Ferrellgas, Inc., 00-2635 (La.9/20/00), 767 So.2d 707.
[4] On the issue of causation, the jury was instructed as follows:

As to the requirement that plaintiff's injury be caused by defendant's conduct, I do not mean that the law recognizes only one cause of any injury, consisting of only one factor or thing, or the conduct of only one person. On the contrary, many factors or things may operate at the same time, either independently or together, to cause injury or damage. You should resolve this question by deciding whether plaintiff would probably not have suffered the claimed injuries in the absence of defendant's conduct. If plaintiff probably would have suffered those injuries regardless of what the defendant did, then you must conclude that the injuries were not caused by the defendant, and render a verdict for that defendant.
If, on the other hand, plaintiff probably would not have suffered the claimed injuries in the absence of defendant's conduct, then you must conclude that defendant's conduct did play a part in plaintiff's injuries, and you must proceed to the next element.
...
An original tort feasor will not be relieved of the consequences of its negligence, unless the intervening cause superseded the original negligence and, alone, produce the injury. If the original tort feasor could or should reasonably foresee the incident that might occur, he will  he will be liable notwithstanding the intervening or superseding cause.
[5] As stated on pages 92-93, supra, the jury verdict form asked whether Empiregas's negligence was a "proximate cause" of the accident, although the jury was instructed as to the law regarding causation under the "substantial factor" test.