JjMCCLENDON, J.
This action was brought by the plaintiff, Commonwealth Insurance Company and other interested underwriters (Commonwealth) as the subrogated insurer of Parker & Parsley Petroleum Company (Parker), now Pioneer Natural Resources, Inc., seeking to recover damages as the result of the blowout of Parker’s Well #2 at Myette Point, in St. Mary Parish, Louisiana, on December 1, 1996. The blowout occurred at a sealing area in a swivel joint, or chiksan[1], supplied by Halliburton Energy Services, Inc. (Halliburton) to Parker and its well control expert, Cudd Pressure Control, Inc. (Cudd). Prior to the commencement of trial, the parties stipulated the amount of damages to be $6,796.225.76, exclusive of interest. Named defendants in the lawsuit were Halliburton and Cudd. Cudd settled prior to trial, and trial proceeded against Halliburton only.
Trial of this matter was held before a jury from August 12-21, 2002. Prior to trial, the trial court decided, in order to simplify matters and avoid jury confusion, that the trial would take place in two phases. The first phase of the trial addressed liability issues and the second phase addressed contractual issues regarding indemnification. The liability phase of the trial lasted seven days, after which the jury unanimously determined that Halliburton was not negligent, that the chiksan was not defective, that Parker and Cudd were both negligent, and that Cudd was grossly negligent. The jury apportioned the fault for the blowout 55% to Cudd and 45% to Parker. Two days of testimony then followed to determine whether Halliburton was entitled to indemnity from Parker. Again, the jury made a unanimous decision and determined that Parker owed indemnity to Halliburton.
A judgment consistent with the jury verdicts was signed on September 23, 2002. On October 1, 2002, Commonwealth and Parker filed a motion for judgment notwithstanding the verdict (JNOV) and, alternatively, a motion for new trial with respect to both the liability and indemnity issues. Following | ¿extensive briefing and argument by the parties, the trial court denied the motions.[2] A judgment reflecting the denial of the motions for JNOV and new trial was signed on May 13, 2003. Commonwealth appealed.[3]
In its appeal, Commonwealth raises seven assignments of error:
*28 1. By finding that Halliburton was not strictly liable, negligent, grossly negligent or otherwise at fault and by assigning 45% of the fault to Parker and 55% to Cudd, the jury committed clear and manifest error; thus, the answers to Interrogatories Number 1-4 on the liability portion of the trial, as incorporated in the Judgment of September 23, 2002, constitutes clear and manifest error.
2. The trial court’s ruling that a New Trial on the Issue of Liability was rendered moot by the jury verdict on the contract issues is incorrect as a matter of law and constitutes reversible error.
3. The trial court’s refusal to disqualify Dennis Stanfield as an expert witness for Halliburton constituted prejudicial and reversible error and is a basis for a new trial on the liability issues.
4. The jury’s answers to Interrogatories Numbers 1-9 on the Contract portion of the trial, as set forth in the Judgment of September 23, 2002, constitute clear and manifest error.
5. The trial court’s refusal to grant a New Trial/JNOV on the indemnity issues constitutes an abuse of discretion.
6. The trial court erred as a matter of law by failing to find that, as between the two documents which the jury found to be contracts, the Hazardous Work Master Service Contract controlled, and therefore that Halliburton was not entitled to be indemnified, held harmless or defended for its own negligence or fault.
7. The trial court’s refusal to strike the deposition testimony of Larry Mitschke and Richard Gonzales constituted prejudicial and reversible error and is a basis for a new trial on the contract issues.
Halliburton answered the appeal seeking attorney fees and costs for the appeal of this matter.
I.STANDARD OF REVIEW
A court of appeal may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong. Bonin v. Ferrellgas, Inc., 03-3024, p. 6 (La.7/2/04), 877 So.2d 89, 94. Under the manifest error standard, in order to reverse a trial court’s determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart v. State Through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La. 1993). On review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221. The reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Bonin, 03-3024 at pp. 6-7, 877 So.2d at 94-95; Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
Nevertheless, recognizing that great deference should be accorded to the fact finder, the court of appeal has a con *29 stitutional duty to review facts. To perform its constitutional duty properly, an appellate court must determine whether the trial court’s conclusions were clearly wrong based on the evidence or clearly without evidentiary support. When two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Bonin, 03-3024 at p. 7, 877 So.2d at 95. The issue Ris not whether the trier of fact’s determination was right or wrong, but whether it was reasonable. Bonin, 03-3024 at p. 12, 877 So.2d at 98.
DISCUSSION
Facts of well blowout
Parker’s Well # 2, State Lease # 5706, was located near one end of a canal that accessed the Atchafalaya River at its other end. Parker developed a workover plan for the well and contracted with Dawson Well Service (Dawson) to provide a rig to perform the job. Parker also engaged the services of Steve Halpin, an independent consultant, to be its company representative at the well site. In connection with the workover, Parker hired Halliburton to provide pumping services.
On November 26, 1996, during downhole operations to cut and remove damaged tubing, the well experienced a sudden flow of gas to the surface, known as a kick. Dawson closed the rig’s blowout prevent-ers and a TIW valve on top of the tubing. Thereafter, a small leak developed in a flange between two blowout preventers on the wellhead, and the Dawson rig was moved offsite. Parker then engaged the services of Cudd to control the well. Parker also engaged the services of Halliburton, which already had a pumping truck on site, to provide pumping services as directed by Cudd.
Because the tubing projected above the well, the TIW valve on top of the tubing was located twenty-five to thirty feet in the air. A crane barge was used to lift personnel and assemble a kill line to be attached to the well. The kill line ran from the Halliburton pump truck, on a separate barge, to the crane barge. The line from the crane barge to the top of the tubing consisted of a two-inch flexible rubber hose. The hose was connected to a valve which was, in turn, connected to a chiksan.
A chiksan is comprised of three sections of steel pipe, threaded on each end where the sections join. The threaded ends contain ball bearings enabling the chiksan to swivel. Additionally, a primary rubber seal is situated where the segments join to compress and prevent leaking. The chik-san in this matter was | designated a 1502 chiksan, meaning that it had a two-inch diameter and was rated to a working pressure of 15,000 pounds per square inch (psi). Halliburton owned the chiksan, which was supplied to Cudd by Halliburton’s pump truck operator from its truck.
On December 1, 1996, after the kill line was completed from the pump truck to the top of the tubing, the line was tested. Two leaks were discovered and corrected. Thereafter, the lines were tested two more times and held pressure of 10,000 psi for short intervals, which were considered successful tests.
After being successfully tested, Cudd opened the valves to the well and instructed Halliburton to pump in kill fluid. The attempt proved unsuccessful. Mark Maz-zella, the Cudd well control specialist, believed a back pressure valve next to the Halliburton truck was responsible, and the valve was replaced. A second attempt to pump into the well failed. At this time, Mazzella made the decision to open a valve in the kill line on the crane barge to determine whether there was a blockage, *30 or hydrate, in the line. When the line was opened, fluid and then gas escaped from the valve. Mazzella quickly closed the valve, but within seconds, the chiksan catastrophically failed at one of its primary seals, causing the well to flow unabated from the top of the wellhead.
As a result of the blowout, the area was evacuated. The well was eventually killed by Cudd on December 5, 1996, but not before the flow of hydrocarbons from the well caused significant environmental damage to the surrounding area. Parker’s insurer, Commonwealth, paid for the environmental cleanup, who now seeks indemnification from Halliburton.
ASSIGNMENT OF ERROR NUMBER 3
Dennis Stanfield’s Testimony
Initially, we address Commonwealth’s third assignment of error, wherein Commonwealth contends that the trial court’s refusal to disqualify Dennis Stan-field as an expert witness was prejudicial and reversible error. Commonwealth avers that the trial court allowed Stanfield to testify on matters |sclearly outside his area of expertise. Commonwealth argues Stan-field saw the chiksan one time in 1997, made a cursory examination, and had never even seen a chiksan before examining this one. Therefore, according to Commonwealth, the trial court erred in allowing Stanfield to give an opinion on failure analysis that the chiksan failed due to incidents of very high impact loading, and that opinion should have been excluded under LSA-C.E. art. 702.
Admissibility of expert testimony in Louisiana is governed by LSA-C.E. art. 702. Louisiana Code of Evidence article 702 sets up a scheme wherein the expert testifies only as to matters that are calculated to be helpful to the jury.[4] Of course, this helpfulness to the jury is to be balanced by a due consideration of the probative value/prejudicial effect balancing test mandated by LSA-C.E. art. 403.[5] State v. Foret, 628 So.2d 1116,1127 (La.1993)
A trial court is accorded broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert. LSA-C.E. art. 702, Official Comment (d). A trial court’s decision to qualify an expert will not be overturned absent an abuse of discretion. Cheairs v. State Dep’t of Transp. and Dev., 03-0680, p. 6 (La.12/3/03), 861 So.2d 536, 540-41.
There are three intertwined bases for excluding testimony under art. 702:(1) if the testimony will not assist the trier of fact; (2) if scientific evidence is not sufficiently reliable; and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors. Generally, experience alone is normally sufficient to qualify a witness as an expert. Cheairs, 03-0680 at p. 8, 861 So.2d at 542. The weight to be given to the testimony of experts is largely |9dependent upon the facts upon which their opinions are based. State, Dep’t of Transp. & Dev. v. Estate of *31 Gñffin, 95-1464, p. 7 (La.App. 1 Cir. 2/23/96), 669 So.2d 566, 570.
On voir dire examination relating to his qualifications, Stanfield testified that he had worked for almost twenty years in the metallurgical engineering department of a testing laboratory primarily related to fail7 ure analysis of metal components. He stated that all the failures he analyzed consisted of pressure-containing components. While with the testing laboratory, approximately sixty percent of his work was related to the oilfield and petrochemical industry. During that time, he had written 2,000 reports on the causes of failure. Stanfield testified that metallurgical analysis is only part of failure analysis, as most things fail due to other forces as well.
Stanfield admitted he had no experience with chiksans before this case and tested the chiksan according to the instructions given to him. He stated that he was asked by Parker to disassemble the chiksan, look at the parts, and- see if he could determine if there was anything wrong with the chik-san and why it failed. He further stated that he had a lot of experience determining failures on other components that were sealed and leaked and were subject to washout, but never specifically with a chik-san prior to this occasion. However, Stan-field testified that he felt qualified to render an opinion in this matter, and that if he felt unqualified, he would have referred the matter to someone else. He stated that he had testified in other courts as an expert metallurgical engineer.
Tendered in the field of metallurgical engineering and failure analysis, the trial court accepted Stanfield as an expert in the field of metallurgical engineering. The trial court explained that while it did not believe Stanfield was qualified to testify about the failure analysis of the chiksan, it would allow Stanfield to give his opinion subject to its weight. The court recognized that Stanfield’s experience gave him some credibility to render an opinion on the issue of failure analysis, but stated that he was not being accepted as an expert in that field. The jury was instructed that, no matter what the field of expertise, | t nevery expert opinion had to be weighed and considered by the jury, and the jury still had the right to either accept or reject the testimony or any portion thereof. Based on these facts, we find no abuse of discretion in allowing Stanfield to testify as an expert in metallurgical engineering.
Moreover, in his nearly twenty years of experience as a metallurgical engineer, Stanfield conducted extensive analysis of the failures of various components and wrote more than 2,000 reports on the causes of failures. Thus, despite the seeming contradiction in the trial court’s statement that Stanfield was not an expert in failure analysis, but that his on-the-job training gave him credibility to render an opinion on that subject, we believe Stan-field’s opinions as to the cause of the chik-san’s failure fell within the scope of his expertise and experience as a metallurgical engineer.
Further, even if Stanfield’s testimony was improperly admitted into evidence, it appears that such error was harmless, as his testimony was corroborated by that of other witnesses.
ASSIGNMENT OF ERROR NUMBER 1
Halliburton’s Liability
In its first assignment of error, Commonwealth asserts that the jury’s answers to Interrogatories Numbers 1-4 on the liability portion of the trial constitute clear and manifest error.
The jury responded to the interrogatories regarding liability as follows:

*32
INTERROGATORY NUMBER 1

A. Do you find that Halliburton Energy Services was negligent and that this negligence was a proximate cause of the blowout at Myette Point on December 1,1996?
YES NO X
B. Do you find that Halliburton Energy Services was grossly negligent and that this gross negligence was a proximate cause of the blowout at Myette Point on December 1,1996?
YES NO X
C. Do you find that Halliburton Energy Services’ chiksan which failed on December 1,1996, was defective?
YES NO X
lnD. Do you find that Halliburton Energy Services knew or should have known of the defect?
YES NO
E. Do you find that the failure of Halliburton Energy Services’ chiksan could have been prevented by the exercise of reasonable care, and that Halliburton Energy Services failed to exercise such reasonable care?
YES NO

INTERROGATORY NUMBER 2

A. Do you find that Cudd Pressure Control was negligent, and that this negligence was a proximate cause of the blowout at Myette Point on December 1, 1996?
YES X NO
B. Do you find that Cudd Pressure Control was grossly negligent, and that this negligence was a proximate cause of the blowout at Myette Point on December 1,1996?
YES X NO

INTERROGATORY NUMBER 3

Do you find that Parker & Parsley was negligent and that this negligence was a proximate cause of the blowout at Myette Point on December 1,1996?
YES _X_ NO _

INTERROGATORY NUMBER I

If you answered yes to any combination of Interrogatories 1, 2, or 3 above, please assign a percentage of fault to the parties below:
Halliburton Energy Services, Inc. 0%
Cudd Pressure Control, Inc. 55%
Parker & Parsley 45%
The key issue in this case is whether the jury’s finding that the chiksan was not defective was manifestly erroneous or clearly wrong. Commonwealth asserts in its brief to this court that there is no dispute that the chiksan at issue in this matter was rated to accommodate pressure of up to 15,000 psi, and that there is no dispute that the chiksan failed catastrophically when exposed to well pressure of approximately 9,000 psi. Both sides, according to Commonwealth, also agree that the point of failure was in a primary seal. The thrust of | ^Commonwealth’s argument is that the failure of the chiksan below its rated pressure proved that a defect existed in the chiksan. Halliburton has responded by stating that while it is undisputed that the chiksan failed just below its rated pressure, that by itself does not prove a defect and that the jury was correctly instructed that a defect is not presumed simply because an accident occurred.
In support of its contention that the chiksan was defective, Commonwealth offered the opinion of Dr. Edmond Bailey, an expert in mechanical engineering. Dr. Bailey examined the damaged chiksan, initially noting that the seal that failed was missing. He concluded after looking at the areas of washout that the seal in the *33 chiksan was either never there or disappeared suddenly and catastrophically at the time of the well blowout. Dr. Bailey testified that the hanging weights on the wellhead did not affect the chiksan and its ability to serve its purpose. He testified that the primary load on the chiksan was the 10,000 psi times the three square inches of cross-sectional area, or 30,000 pounds. The hose weighed about 250 pounds and, therefore, according to Dr. Bailey, that weight was not significant relative to the 30,000 pounds.
Dr. Bailey testified that he had never seen that kind of seal failure before on a chiksan. He conducted tests to determine the cause of the failure. He tried to determine if the seal could have been sucked away and determined that in a new chik-san the seal would not have been sucked out. Dr. Bailey concluded that the seal in this chiksan failed in an unexpected catastrophic manner, causing the blowout.
On cross-examination, Dr. Bailey testified that there were six to eight swivel joints in the kill line from the pump truck to the well site and that the only one that failed was the one at the top of the line. It was also the only swivel joint that was unsupported. He admitted it definitely would have been beneficial for Cudd to support the tubing and to be able to get to the valve at the top of the wellhead. He also admitted concern about the tubing falling over and saw it as a danger. The tubing’s only support was its own structural strength. He | ^admitted that Mazzella should have been paying more attention to these factors. He was also concerned about Mazzella opening the vent line as quickly as he did, but testified that he believed Mazzella’s actions did not cause the seal to fail.
Dr. Bailey further admitted that at least twice the line was tested to 10,000 psi. He stated it would have been better to test it to 15,000 pounds, but conceded that was not possible at Myette Point because of the hose, and not because of the chiksan. Dr. Bailey opined that the dynamics of the pressure changes caused the chiksan to catastrophically fail and that the chiksan should have been able to withstand those loads. Additionally, he testified that the pump chart, recorded at the time of the well blowout, showed that the pressure did not drop below 4,000 psi. Therefore, Dr. Bailey testified, this indicated that Mazzel-la’s opening of the valve did not create a dramatic change in pressure.
Dr. Bailey further believed that there was a hydrate plug in the line because of the cold weather, high pressure, and the presence of gas and water in the line. He stated that a hydrate can become slushy solid and block this kind of line. He testified that Mazzella was trying to dislodge the hydrate plug and was creating a surge away from the blockage. Dr. Bailey was of the opinion that the well blew out when Mazzella opened the valve, which dropped the pressure, and the hydrate started moving. He believed the hydrate plug came apart and hit the chiksan. Dr. Bailey testified, however, that he did not believe the hydrate plug caused impact damage on the chiksan because it did not have sufficient strength to cause that kind of damage. He testified that a hydrate plug has mass, but no strength. It would simply flow. He further testified that while there were some significant dynamics (i.e. surging the well), there were no dynamic loads transmitted up the hose. Therefore, according to Dr. Bailey, the cause of the failure had to be the seal itself.
With regard to his testing, Dr. Bailey testified that the purpose of his tests was to show the decay rate of pressure as it passed by a seal. Dr. Bailey testified that the test was not to see the effect of the pressure wave going up the pipe, as the *34 tubing in his tests' was on the ground unlike the actual 114conditions at the well site. He believed, however, that if there had been a good seal and a good chiksan at the top of the well, there would not have been a blowout. At worst, he opined, there might have been a leak.
On the other hand, Halliburton contends that Dr. Bailey’s testimony not only failed to prove a defect in the chiksan, but that the testimony of its expert witness, Dennis Stanfield, proved that no such defect existed. Having been accepted as an expert in the field of metallurgical engineering, Stanfield testified that he was initially hired by Parker and conducted the first visual inspection of the chiksan after the blowout. Jeffrey Bookout, Parker’s senior operations engineer in charge of the Myette Point workover, testified that after the blowout, he asked Steve Phillips, his consultant on location at the time, to secure the chiksan and deliver it to Maxim Technologies, a recommended third-party testing facility in Houston, Texas, to determine the cause of the failure. Bookout testified that he wanted someone to examine it who was not affiliated with Parker or Halliburton. Bookout testified that he met with Stanfield, the manager of the Maxim’s metallurgical engineering division, in Houston, along with a representative from Halliburton, to observe Stanfield disassemble and examine the chiksan.
According to Stanfield’s report, dated January 31, 1997, “[n]one of the components displayed evidence of any material defects or anomalies, or conditions which would represent cause for failure of the assembly.” The report concluded that “[a]ll of the evidence exhibited by the assembly was consistent with failure at a seal area as a result of excessive in-service stresses.”
At trial, Stanfield again gave his opinion that he saw no evidence that the components were defective, seeing no cracks or evidence that corrosion was the cause of failure. Stanfield believed that the nature of the failure and the washout evidence was evidence to him that the seal had been compromised due to excessive in-service stresses. He testified that the chiksan had passed two pressure tests at 10,000 psi, indicating that the system had structural integrity in that the piping and connections were able to withstand that pressure. The hspressure tests also indicated that the seals in the assembly were capable of sealing at that amount of pressure. Stanfield testified that he disagreed with Dr. Bailey’s testing because Dr. Bailey tested with static pressure, i.e., with the pipes lying on the ground, and not with dynamic forces. Stanfield testified that the seal failed because the seal was compromised by the forces imposed on the chiksan due to the dynamics of the well situation. Based upon the information provided to him that Mazzella tried to purge the well by rapidly opening the valve and causing an extreme loss of pressure, Stanfield believed that the impact of the hydrate plug hitting the turn in the chiksan was enough to compromise the seal area. Once compromised, there was a catastrophic failure. Stanfield concluded that the chiksan failed because of the way it was used.
Donald Bazer, Halliburton’s expert in petroleum engineering, testified that the problems with the first leak were caused by Parker’s poor planning and execution. Bazer stated that potential problems exist with any dynamic kill following a leak, and Parker opted for a method of pumping down the tubing to kill the well. Bazer explained that it was below industry standards to pump into something that is standing up on its own weight, and that a competent well control man or company man should have a plan for a worst case scenario to avoid a loss of well control, as *35 happened here. He testified that a hydraulic valve at the top of the tubing would have prevented the blowout, and that the well was wide enough for another barge to bring a crane in to support the tubing. In this case, there was no secondary method of well control. Bazer also believed that hydrates were a possibility in this event and that a dramatic dynamic reaction might have occurred when the well was surged and the pressure dropped from 10,000 psi to 0. He stated the same failure probably would have occurred with a new chiksan and that the blowout was not the fault of the chiksan but the manner in which the kill line was hooked up. The system had been successfully tested twice up to 10,000 psi. Bazer testified that there was approximately 31,000 pounds of axial load on the line. He testified that while there were other chiksans in the kill line assembly, the only chiksan in the gas | j ¿flow stream was the one at the top of the tubing, which was also the one that failed. Bazer testified that in his opinion the well blew out because of 1) the weight of the pipe, 2) Mazzella’s surging the well too violently, and 3) Mazzella’s failure to recognize the possibility of hydrates.
Additionally, Bazer discounted Dr. Bailey’s tests because Dr. Bailey used a very sensitive electronic recorder, whereas the pressure recorder on the pump truck used a pen. He testified that the recorder on the truck is dampened intentionally so that it does not vibrate with pulsations in the line. Therefore, according to Bazer, the pressure drop could have been much lower than the 4,000 psi as recorded on the pump truck when Mazzella tried to surge the well, and contrary to Dr. Bailey’s opinion, the drop in pressure as recorded on the truck did not negate the likelihood of Maz-zella opening the valve too quickly. Dr. Bailey himself acknowledged that the pen recorder was “not that quick.”
Paul Saulnier, manager of well control for Cudd in 1996, testified that it was not safe practice to open valves too quickly. He also testified that he, Jeff Bookout, Steve Phillips, and Mark Mazzella considered putting a remote control valve at the top of the tubing but that would have required more lines and hydraulics resulting in more weight. Thus, they collectively decided not to add the weight since the tubing was not supported.
Jeff Bookout was senior operations engineer at Parker. He testified that he had recommended the workover of the well and that all procedures regarding the kill line were approved by him. Parker and Cudd determined the physical hookup of the assembly, not Halliburton. Bookout testified that the hook-up of the chiksan, twenty-eight feet in the air, was not normal procedure.
Stephen Barrett, manager for the chik-san manufacturer, FMC, and Commonwealth’s own witness, testified regarding his concerns over external loading on the swivel joint and the potential that such loading might cause a gap in the seal. Barrett stated that chiksans are not recommended for use as support and are not designed to hold structural loads.
|17Carl Frietag, the service supervisor for Halliburton, testified that he told Maz-zella that he wanted the kill line assembly supported as there were three to five hundred pounds of iron hanging, but that he was overruled by Mazzella. Frietag further testified that when Mazzella could not pump into the well after several attempts, Mazzella seemed irritated and slammed the valve open. Frietag testified that it was his opinion that the seal was cut by the pressure wave of gas.
With regard to Commonwealth’s argument that the chiksan was poorly maintained, Frietag testified that the ears of the chiksan hammer unions are hit with a *36 sledge hammer to tighten them up, so it does not take long before a chiksan looks battered and worn out. He stated that he had seen some much worse than the one at issue in this matter. Other testimony from other witnesses corroborated Friet-ag’s testimony that chiksans in similar condition are not uncommon in the industry. Frietag further testified that he gave Maz-zella the chiksan after visually inspecting it, and that it had a maintenance band on it. Mazzella also testified that he visually inspected the chiksan before putting it to use and that he found no problem with its condition. In his testimony, Bailey admitted that if there had been a band on the chiksan, there was a possibility that it could have been cut off from the washout of the fluids after the failure of the seal.
After a thorough review of the record, we cannot say that the jury did not have a reasonable factual basis or was clearly wrong in its factual determination that the chiksan was not defective and that Halliburton was not negligent. The evidence presented enabled the jury to reasonably conclude that the well blowout was not caused by a defect in the chiksan as the jury could have reasonably inferred that the manner in which the kill line was hooked up and the dynamic forces involved caused the seal to fail. Two permissible views of the evidence existed and the fact finder chose to believe Halliburton’s version of events rather than that of Commonwealth. Accordingly, we find no manifest error in the jury’s conclusion.
I ^ASSIGNMENT OF ERROR NUMBER 2
Motion for New Trial
In its second assignment of error, Commonwealth asserts that the trial court’s ruling that a new trial on the issue of liability was rendered moot by the jury verdict on the contract issues is incorrect as a matter of law. Having found no manifest error in the fact finder’s determination of liability, we pretermit consideration of this assignment of error.
ASSIGNMENTS OF ERROR NUMBERS 4 — 7
The Indemnity Issue
Further, because we find that the fact finder was not clearly wrong in its factual determinations regarding liability, we find it unnecessary to discuss assignments of error numbers four through seven regarding indemnification.[6]
*37 ANSWER TO THE APPEAL
Halliburton has also answered the appeal, seeking additional attorney fees for defending Commonwealth’s appeal. We note that the trial court has reserved jurisdiction in its September 23, 2002 judgment to set at the trial court level, the fees, costs and expenses incurred by Halliburton in defense of this matter. Accordingly, we do not entertain Halliburton’s request for attorney fees at this time.
| ^CONCLUSION
Because we find no manifest error in the fact finder’s factual determinations regarding the liability of Halliburton, we affirm the judgment of the trial court. Costs of this appeal are assessed to Commonwealth.
AFFIRMED.

. The swivel joint has been referred to as a "chiksan,” "chicksan” and "chicsan” in this litigation. For consistency in the opinion, we will refer to it as a "chiksan.”

. Initially, Commonwealth contended that the trial court granted its motion for new trial on the liability issue. The trial court did indicate that it would grant a new trial on the liability issues in its Ruling of Court on February 24, 2003. Halliburton thereafter filed its Notice of Intention to Apply for Supervisory Writ of Review with this court. Thereafter, on April 28, 2003, the trial court issued a Per Curiam in which it stated in pertinent part: "The writ application is premature. The Court's ruling on the granting of a new trial on the issue of liability is not final.” Ultimately, on May 13, 2003, the trial court rendered judgment denying Commonwealth's motions for JNOV and New Trial. Commonwealth acknowledged that the motions for JNOV and new trial were denied in its Petition For Appeal, filed on June 12, 2003.

.Commonwealth appealed not only the judgment of September 23, 2002, but also that of May 13, 2003, which denied its motions for JNOV and a new trial. Commonwealth's assignments of error refer only to the denial of the new trial motion. 4lowever, the denial of a new trial motion is ndt an appealable judgment absent a showing of irreparable harm. State ex rel. Dept. of Soc. Serv. V. A.P., 02-2372, p. 4 (La.App. 1 Cir. 6/20/03), 858 So.2d 498, 501. In this matter, Commonwealth clearly appealed the September 23, 2002 judgment on the merits.F

. LSA-C.E. art. 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

. LSA-C.E. art. 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.

. However, we do note the recent United States Fifth Circuit decision of Houston Exploration Co. v. Halliburton Energy Services, Inc., 359 F.3d 777 (5th Cir.2004), which involved a similar indemnity provision on work tickets. In the Houston Exploration case, the Fifth Circuit recognized that repeated approval of work orders manifested the scope of the company man’s authority. There, as here, work orders were signed without objection before and after the well blowout. Furthermore, Halliburton, in that case, as in this matter, refused to commence well operations unless the operator agreed each time to the terms of the work order. Without the company man's consent to the indemnity provision, Halliburton would not have provided the service in either case. Therefore, the court in Houston Exploration determined that the company man's consent to the indemnity provision was reasonably related to the agent's position and was a reasonable and necessary concomitant of the agent’s express authorization, citing AAA Tire & Export, Inc. v. Big Chief Truck Lines, Inc., 385 So.2d 426 (La.App. 1 Cir.1980). The Fifth Circuit concluded:
In the end, [the operator’s] management consented to Halliburton’s release and indemnity provision, despite any earlier misgivings .... Accordingly, we conclude that [the company man's] express authority to enter into the work order agreements necessarily included the implied authority to consent to the release and indemnity provision.