**CREOLE GARDENS, L.L.C.**   *      NO. 2019-CA-0105

**VERSUS**             *
                         **COURT OF APPEAL**

**KLAUS-PETER F. SCHREIBER**   *
**AND SARAH LEONARD**       **FOURTH CIRCUIT**
**SCHREIBER**          *

                         **STATE OF LOUISIANA**
                    * * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2002-03254, DIVISION "N-8"
Honorable Ethel Simms Julien, Judge
* * * * * *
**Judge Paula A. Brown**
* * * * * *
(Court composed of Chief Judge James F. McKay, III, Judge Paula A. Brown,
Judge Dale N. Atkins)


Louis R. Koerner, Jr.
KOERNER LAW FIRM
1204 Jackson Avenue
New Orleans, LA 70130--5130

    COUNSEL FOR PLAINTIFF/APPELLANT


LEEFE GIBBS SULLIVAN & DUPRE, LLC
George L. Gibbs
3900 North Causeway Boulevard
Suite 1470
Metairie, LA 70002

THE KOEHLER LAW FIRM
Steven John Koehler
3350 Ridgelake Drive
Suite 200
Metairie, LA 70005

    COUNSEL FOR DEFENDANTS/APPELLEES


                    **AFFIRMED**
                 **September 25, 2019**

This appeal arises out of a redhibitory breach of warranty action. The Appellant/Buyer, Creole Gardens, L.L.C ("Creole Gardens"), brought suit against the Appellee/Sellers, Klaus-Peter F. Schreiber and Sarah Leonard Schreiber (collectively, the "Schreibers"), alleging the Schreibers breached the agreement to purchase a hotel (the "property"), which the Schreibers warranted there were no governmental liens, fines, or violations against the property. After trial on the merits, the district court dismissed Creole Gardens' petition for damages and quanti minoris with prejudice. Concluding there was no error in the district court's findings, we affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

In 1999, the Schreibers were the owners of the property, then known as the Prytania Inn 1. On July 29, 1999, the New Orleans Fire Department ("NOFD") cited the property for several fire code violations. The Inspection Report ordered the Schreibers to correct the following violations:

1. Provide Portable Fire Extinguishers, Min. Rating 2A10BC, That Are Available To Each Guest Room. NFPA10

1

2. Provide An Approve [sic] Range Hood Suppression System Over Stove When Cooking For Guest Or Remove Stove. NFPA96

3. Provide An Approved Fire Alarm System. NFPA101.17-3.4

4. Maintain Emergency Lighting. SFPC. 603.2

5. Maintain Smoke Detectors in Guest Rooms. SFPC 603.2

6. Refer. To Main Building, Each Guest Room Door Shall Be Self Closing. NFPA101.7-3. 6.3

7. Refer. To (Slave Quarters Building), Provide An Approve [sic] 2nd Exit From 2nd Floor, Spiral Stairs Not Acceptable. NFPA101.17.2.2.3

8. Refer. To Main Building (One Stairway), Provide An [sic] 2nd Exit From Each Floor. NFPA101.17-2.4.

The citation stated that a $50.00 re-inspection fee would be assessed and municipal charges filed if the violations were not corrected by August 30, 1999. The Schreibers retained Michael R. Laughlin, a Life Safety Code consultant, to address the violations. On August 25, 1999, Mr. Laughlin sent a "plan of corrections" for the eight violations to Thomas St. Germain, a NOFD inspector.

Sometime later, the Schreibers and Creole Gardens through its individual owners, Karen Bacharach and Andrew Craig, entered discussions to sell the property. On July 10, 2000, the Schreibers and Creole Gardens executed an "Additional Terms and Conditions Agreement to Purchase or Sell the Property" (the "Purchase Agreement") for $850,000.00. The Purchase Agreement required the Schreibers to warrant that there were no governmental liens against the property; identified a room that might require a second means of fire egress;

2

permitted Creole Gardens to inspect the property; and stated that the property was being sold "as is."[1]

The Schreibers and Creole Gardens executed the Cash Sale of Property ("Act of Sale") on February 28, 2001. The Act of Sale provided that the property would be sold without any warranties; that Creole Gardens waived any right of redhibition and/or quanti minoris; and that Creole Gardens had conducted a diligent inspection of the property.[2]

---

[1] The terms of the Purchase Agreement at issue provided:

> Further, Sellers warrant that there are no governmental liens, judgments, fines, violations, etc., of any kind on the property. Sellers agree to be solely responsible for the above.
>
> . . .
>
> Please note that: Purchaser has been made aware that Purchaser may need to
>
> provide a second means of fire egress for Room 7A.
>
> . . .
>
> Seller, upon signing of this Agreement, immediately allows Purchaser and its agents to make any and all inspections of the above physical condition and use of Prytania Inn 1, (1415-1427 Prytania St.), so as to completely satisfy Purchaser as to the suitability of his purchase and will hold Seller harmless from any and all injurious and deleterious events or actions arising after the Act of Sale by Seller.
>
> . . .
>
> Seller is selling the properties at 1415-1427 Prytania St. (Prytania Inn 1) strictly in the physical, "as is" condition inspected by the Purchaser and makes no representation as to the suitability, present business, and proposed business uses anticipated by Purchaser."
>
> Purchaser shall have until August 21, 2000 to do their full diligence tests and inspections relating to the above Agreement to Purchase and to its additional terms and conditions.

[2] The Act of Sale specified the following terms and conditions:

> Vendees accept the property and all of the improvements thereon in whatever condition it [sic] exist as of the date herein without any warranty as to the validity of the title. Seller makes not [sic] warranties of any sort whatsoever and Purchaser expressly waives rights of redhibition and/or quanti minoris. Seller makes no representations nor warranties whatsoever relating to the use and occupancy of said premises, the square footage of the dwelling and/or fitness of

3

The parties agreed that the Schreibers would continue to operate the hotel until late April. On April 6, 2001, the Department of Safety & Permits (the "Dept. of S&P") renewed the Schreibers' occupational license. Creole Gardens took possession of the property on April 29, 2001, and began renovations and repairs, including painting, tearing up, and replacing rotted, termite-infested flooring.

Creole Gardens applied for an occupational license near the beginning of May, 2001. The Dept. of S&P denied Creole Gardens' application on May 10, 2001. Thereafter, on July 31, 2001, the Dept. of S&P issued a stop work order to Creole Gardens; and on August 22, 2001, NOFD cited the property for fire code violations similar to the Shreibers'1999 fire code violations.[3] From September 2001 until September 2002, Creole Gardens rented only four of the property's twenty-six rooms.

---

the property and its improvements for any particular purpose. Purchaser acknowledges that a diligent inspection of the premises has been made and Purchaser has taken all deficiencies and defects, if any, into consideration in bidding. Purchaser accepts the property in its existing "as is' condition and Purchaser agrees that Seller shall have no responsibility or liability whatsoever for any repairs after the sale and these stipulations shall survive the delivery of the title at the closing.

[3] The 2001 fire code violations encompassed the following:

1.  Provide An Approve [sic] Fire Alarm Sys. LSC17-3.4

2.  Provide Emergency Lighting. LSC17-2.9

3.  Provide Approved Smoke Dectectors For Sleeping Rooms. LSC17-3.4.4.2

4.  Provide Approved Stairway, Spiral Stairs Not Acceptable. LSC17-2.2.3

5.  Interior Stairwells Shall Be Properly Enclosed. LSC17-2.2.4

6.  Provide Approve [sic] Second Means Of Egress From Every Guest Room. LSC17-2.4

7.  Have Available For Each Room An Approved Portable Fire Extinguisher, Min. Rate 2A10BC. SFPC603

In February 2002, Creole Gardens filed a petition for damages and quanti minoris (the "Petition"). The Petition alleged the Schreibers breached the Purchase Agreement's warranty against any existing governmental violations on the property, specifying the fire code violations. Creole Gardens sought to recover lost income and construction expenses allegedly sustained when it ceased operations to remedy the fire code violations and a reduction in the purchase price based on the property's purported depreciation.

A bench trial was held on March 5-7, 2018. On May 17, 2018, the district court rendered judgment in favor of the Schreibers and dismissed Creole Gardens' Petition. On September 7, 2018, Creole Gardens moved for new trial, which the district court denied. Thereafter, the district court granted Creole Gardens' timely motion for a devolutive appeal.

## STANDARD OF REVIEW

This case presents dual standards of review. In reviewing matters involving the proper application of legal principles or the interpretation of laws, appellate courts conduct a *de novo* review of the record to render an independent judgment. *First Nat. Bank, USA v. DDS Const., LLC*, 2011-1418, pp. 10-11 (La. 1/24/12), 91 So.3d 944, 952. In such cases, the district court's findings are not entitled to deference by the reviewing court. *Id.*, 2001-1418, p. 11, 91 So.3d at 952.

In contrast, appellate courts employ the manifest error or clearly wrong standard of review in reviewing questions of fact as determined by the factfinder, including its findings of liability. *Gaines v. Wilson*, 2017-0895, pp. 4-5 (La. App. 4 Cir. 3/21/18), 240 So. 3d 1010, 1013-14 (citations omitted). In order to reverse the findings of the factfinder, the appellate court, upon a review of the record in its entirety, must determine that (1) no reasonable factual basis exists for the district

5

court's factual findings and (2) the findings must be clearly wrong. *Gaines*, 2017-0895, p. 5, 240 So.3d at 1014.

## DISCUSSION

Creole Gardens raises several assignments of error, which essentially fall within two categories: (1) the district court committed legal error in its failure to apply the doctrine of the "obligation of result" to assess the Schreibers' liability and evaluate the burden of proof; and (2) the district court erred in its failure to find that governmental violations existed on the property at the time of sale and the Schreibers knowingly made false statements concerning the existence of those violations. We will address each assignment of error in turn.

*Doctrine of Obligation of Result*

In reaching its decision, the district court determined that Creole Gardens' claims are governed by La. Civil Code Articles addressing redhibition—the remedies and rights available to a buyer against the seller for a breach of warranty against redhibitory defects.[4] The district court, in its reasons for judgment, wrote:

> While plaintiff purchased the property "as is", under Louisiana law, the sellers [the defendants] must warrant that the property is free from redhibitory defects. [See La. C.C. article 2548.] However, a buyer is not bound by an otherwise effective exclusion or limitation of warranty when the seller declares that the property has a quality that he knew it did not have. [See La. C.C. article 2548.] This warranty does not apply to defects that were known to the buyer, or that should have been discovered by a reasonably prudent buyer. [See La. C.C. article 2548.] Therefore, a buyer must show that the seller knew of the redhibitory defect[s].
>
> In the case at bar, the defendant/sellers specifically warranted that there were no violations of any kind on the property.

---

[4] La.C.C. art. 2520 provides, in part, "[a] defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect."

6

Plaintiff asserts that as there were pre-existing Life Safety Code violations, this statement was false. Plaintiff further asserts that defendants knew it was false because they had never remedied these Life Safety Code violations.

The burden of proof is on plaintiff to prove by a preponderance of the evidence that: the statements made by defendants were false; that defendants knew that the statements were false; that these statements induced plaintiff to purchase the property; that plaintiff suffered some damages due to the false statements; and that the defect was something that plaintiff could not have discovered with reasonable diligence.

Considering the law and evidence, the court finds that plaintiff has not met its burden of proof.

Following, Creole Gardens filed a motion for new trial. Creole Gardens argued the district court committed an error of law in its finding that the contract agreement between Creole Gardens and the Schreibers created an obligation of means and diligence, rather than an obligation of result. The district court denied the motion for new trial, explaining:

In support of its position that Louisiana law recognizes obligations of result, plaintiff cites La. C.C. arts. 1994, 1873 and 1986 for the proposition that an obligor is liable when he fails to perform his obligation unless this non-performance was caused by a fortuitous event. Plaintiff also cites jurisprudence involving parties with client-attorney relationships wherein the clients alleged that counsel had warranted or guaranteed a particular result they had not achieved. . . . The court notes that these courts declined to find that the attorneys had warranted or guaranteed a specific result.

Considering the law and evidence, [sic] finds that the Agreement did not create an obligation of result. Initially, in this case, the parties had no client-attorney, fiduciary relationship. Rather, their only relationship was that of a buyer and a seller of immovable property.

Furthermore, this was an "AS IS" sale and plaintiff was given approximately one month to conduct its due diligence as to the property. . . .

The court further finds that even if this could be construed as an obligation of result, there is no documentary evidence that any

7

governmental violations did exist at the time of the sale – merely speculation.

On appeal, Creole Gardens reiterates that the district court committed legal error in failing to find the Purchase Agreement's warranty of no governmental violations resulted in an obligation of result—a legal principle Creole Gardens notes was primarily developed and espoused by French commentators.[5]

Relying on these commentators, Creole Gardens represents that the obligation of result occurs when the debtor has made a commitment to obtain a determined result. Liability inevitably attaches to the debtor when the result is not reached; liability can only be removed in the event the debtor proves a "force majeure"[6] prevented its accomplishment. Creole Gardens maintains that when the Schreibers warranted/promised that the property had no fire code violations, their promise bound them to this obligation of result and thereafter, liability attached when they failed to deliver on their promise without an intervening force majeure. As such, Creole Gardens argues the Schreibers were not relieved of liability regardless of whether they knowingly misrepresented the existence of the fire code violations or Creole Gardens had conducted a due diligence inspection of the property. Creole Gardens avers this Court should rely on the "appropriate and persuasive guidance" provided by French authorities in the obligation of result

---

[5] Creole Gardens cites, in part, R. Demogue, Traite des obligations en general, Volume I, p. 1237, (1923) and H. Mazeaud, Essai de classification des obligations, Rev. trim. De. Civ. 1, (1936); and P. Le Tourneau, Contrats et obligations, principe de la distinction des obligations de moyens et des obligations de resultat, fasc. 19[ ], who defined the obligation of result as follows:

> Far from being content to simply undertake to employ the appropriate means in a task to be accomplished, the debtor may promise the creditor to procure him a definite result, per fas and nefas. He is then bound by an obligation of result, so-called determined. The content of the obligation is no longer an activity, an effort or means, but the result itself of these activities.

[6] Creole Gardens relies on the definition of "force majeure" defined by the Cour de cassation, ass. plen., Apr. 14, 2006, Bull. Civ., No. 04-18.902 as "the event presenting an unpredictable nature during the conclusion of the contract and irresistible in its execution."

doctrine, noting the correlation between our Civil Code and the French Civil Code. Creole Gardens contends the obligation of result concept is supported by La. C.C. arts. 1994, 1873, and 1986, which, when read in *paria materia*, holds the obligor liable to the obligee for damages arising out of the obligor's failure to perform a conventional obligation, unless the failure to perform was caused by a fortuitous event.[7]

This Court acknowledges the confluence with French authorities in the development of our Civil Code and statutory schemes. However, notwithstanding that confluence and any theoretical support for the doctrine provided by La. C.C. articles 1994, 1873, and 1986, Creole Gardens' argument that the district court committed legal error in not applying the obligation of result doctrine is fundamentally flawed.

Creole Gardens' Petition alleges that it "purchased the property from [the Schreibers] in "as in" condition. However, [Creole Gardens] is entitled to and seeks recovery of all damages occasioned by defects in the premises related to the fire safety violations because of the intentional misrepresentations and bad faith" by the Schreibers and a reduction in the purchase price. Our review of existing Louisiana redhibition statutes and established jurisprudence interpreting these

---

[7] La. C.C. art. 1994 states, in pertinent part, that '[a]n obligor is liable for the damages caused by his failure to perform an obligation."

La. C.C. art. 1873 provides, in relevant part, that "[a]n obligor is not liable for his failure to perform when it is caused by a fortuitous event that makes performance impossible."

La. C.C. art. 1986 provides, in pertinent part, that "[u]pon an obligor's failure to perform an obligation to deliver a thing, or not to do an act, or to execute an instrument, the court shall grant specific performance plus damages for delay if the obligee so demands."

statutes provide sufficient, appropriate and persuasive guidance to decide the claims raised by Creole Gardens in its Petition.

Pursuant to La. C.C. art. 2545, the seller is liable to the buyer for the return of the purchase price, damages, expenses, and reasonable attorney's fees in the event the seller omits to tell the buyer the thing sold has a defect or the seller misrepresents the thing sold has a quality he knows it does not have.[8] Nonetheless, La. C.C. art. 2548[9] permits the parties to agree to exclude the warranty against redhibitory defects, an agreement Creole Gardens and the Schreibers confected in their Purchase Agreement. As referenced in the Purchase Agreement, the property was sold "as is;" and Creole Gardens waived any redhibitory warranties and any right to quanti minoris, a reduction in the sale price. Even so, as cited by the district court, La. C.C. art. 2548 also provides that the buyer, Creole Gardens, is not bound by this redhibitory waiver in the event the sellers, the Schreibers, warranted that the property had a quality, i.e, no governmental violations, the sellers *knew* it did not have.

---

[8] La. C.C. art. 2545, states, in part:

> A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees.

[9] La. C.C. art. 2548 provides, in relevant part:

> The parties may agree to an exclusion or limitation of the warranty against redhibitory defects. The terms of the exclusion or limitation must be clear and unambiguous and must be brought to the attention of the buyer.
>
> A buyer is not bound by the otherwise effective exclusion or limitation of the warranty when the seller has declared that the thing has a quality that he knew it did not have.

We conclude that Creole Gardens' Petition asserts redhibition claims, contractual in nature, arising from an alleged breach of warranty of the thing sold by the sellers, the Schreibers. La. C.C. art. 2548 clearly delineates Creole Gardens' rights as the buyer to acquire property free of redhibitory defects known by the Schreibers in an "as is" sale. Consequently, we find no legal error in the district court's reliance on our redhibition statutes, particularly, La. C.C. art. 2548, to determine the Schreibers' breach of warranty against fire code violations and Creole Gardens' burden of proof. Accordingly, this assignment of error lacks merit.

Having found that the district court did not commit legal error in its application of legal principles or its interpretation of the law, we now examine the district court's factual findings.

*District Court's Factual Findings*

Creole Gardens asserts the testimony and evidence presented at trial supported a finding that fire code violations existed on the property at the time the property was purchased, and the Schreibers knowingly failed to disclose those violations.

The pertinent testimony elicited at trial is as follows:[10]

Ms. Bacharach, one of the 50% owners of Creole Gardens, testified that her purpose in purchasing the property was to acquire an "up and running" hotel. She described the property as "ugly" and "seedy." She anticipated doing a lot of painting, making other cosmetic changes, and adjoining the property with an

---

[10]There was no direct testimony offered by the Schreibers at trial. Sometime during the pendency of this litigation, Klaus-Peter Schreiber became incapacitated and Sarah Leonard Schreiber passed away. As such, Dianne Anderson appeared as curatrix for Klaus-Peter Schreiber and Kirsten Watson appeared as the independent executrix of the succession of Sarah Leonard Schreiber.

adjacent property she and the other co-owner owned. Ms. Bacharach said she relied on Mr. Schreiber's warranty that the property did not contain any governmental violations. She believed Mr. Schreiber was trustworthy in that he had disclosed that one of the rooms required a second means of fire egress. Ms. Bacharach testified it was primarily the other co-owner's responsibility to do the "due diligence" inspection required of the buyer in the Act of Sale.

Mr. Craig, the other 50% owner in Creole Gardens, testified that he holds a general contractor's license. At the time of this transaction, he had worked principally out of New York and New Jersey. He said after Mr. Schreiber revealed a fire code egress issue with one of the rooms, he went to the Dept. of S&P asked it to "punch up" any records on the property. There were no violations on the property. Mr. Craig admitted he did not go to NOFD nor did he hire any other professionals to inspect the property for termites, electrical issues, or fire code violations before the purchase. Mr. Craig said he made a mistake and it was a "sin of omission" for failing to ask NOFD about any fire code violations, expressing his belief that he would only have to do a "lipstick on a pig thing" to upgrade the property. Shortly after renovations began, termites were discovered. Mr. Craig testified that he gave his contractor the authorization to repair the termite damage and rotted floors, but his contractor went "well beyond" the request to repair the termite damage. Mr. Craig relayed that his contractor also started construction work that was a part of Creole Gardens' overall future plans to upgrade the property. Mr. Craig conceded that he needed a permit before he started construction on the property. He said the building inspectors told him that once Creole Gardens' renovation work exceeded over 50% of the area or value of the

12

property, Creole Gardens was required to bring the property up to the most recent modern code.

Leslie Alley, the Dept. of S&P's zoning administrator, explained that when ownership changes, the new owner is required to obtain a new occupational license. After Creole Gardens applied for an occupational license, Ms. Alley directed Robert McDonald, a zoning and building inspector, to inspect the property for the occupational license.

Mr. McDonald testified that based on Creole Gardens' status as the new owners, the Dept. of S&P requested Creole Gardens to submit its building plans for the property. He said the Dept. of S&P denied Creole Gardens' first request for an occupational license on May 10, 2001 because Creole Gardens had failed to submit the required building plans. Mr. McDonald testified the denial of the occupational license was unrelated to any fire code violations.

Thomas Dwyer, also a Dept. of S&P building inspector, inspected the property on July 31, 2001. Mr. Dwyer testified he shut down construction work on the property because Creole Gardens had started "demolition" work without first obtaining a building permit.

David Glasgow, Creole Gardens' architectural expert, was retained by Creole Gardens in August 2001 to submit plans to the Dept. of S&P on behalf of Creole Gardens so that Dept. of S&P could obtain its occupational license. At the time of his initial retention, he was not aware of any fire code violations. Mr. Glasgow acknowledged that the construction work undertaken by Creole Gardens required a Dept. of S&P permit. He testified that the Dept. of S&P shut down construction on July 31, 2001 based on the extent of the renovations and repair work performed without a permit—not because of fire code violations. Mr.

13

Glasgow reiterated that once the Dept. of S&P determined that the construction work exceeded 50%, the "fifty percent rule" required Creole Gardens to bring the property in compliance with the most recent safety codes, including the fire codes.

Mr. Laughlin, the Schreibers' safety expert, testified he proposed a plan of corrections to address the 1999 fire code violations. The plan was accepted by Mr. St. Germain and implemented by the Schreibers.[11] Mr. Laughlin maintained he persuaded Mr. St. Germain to waive corrections of the approved fire alarm system, the approved second exit from the second floor spiral stairs and the main building stairway, arguing the Prytania Inn I building needed only to comply with the fire safety codes in effect at the time the building was placed in service. Mr. Laughlin also said that a follow-up fire inspection conducted on October 1, 1999, did not yield any violations. Mr. Laughlin testified he never received any other violation notices or notice of an administrative hearing for any outstanding code violations.

---

[11] The plan of corrections proposed by Mr. Laughlin included the following:

1. Portable fire extinguishers, min. rating 2a10bo accessible to each guest room NFPA10 will be installed.

2. Stove in kitchen will be removed.

3. Owner will provide evidence of compliance with required alarm system.

4. Existing emergency lights will be inspected and repaired as need [sic] to work properly.

5. Each smoke detector will be inspected and maintained to work properly.

6. Each guest door in main building will be inspected and made to close in compliance with NFPA101.17-2.3

7. (Slave Quarters building) Exit from 2nd door floor to comply with NFPA101.17-2.3

8. Main Building Owner shall submit plans and specifications for exit from each floor in accordance with NFPA101.17-2.4.

He told the Schreibers the 1999 fire code citations were resolved and closed his file.

Thomas St. Germain, a NOFD inspector, acknowledged that he wrote the 1999 fire code violations inspection report directed to the Schreibers and the 2001 fire code violations inspection report directed to Creole Gardens. As to the 1999 fire code violations, Mr. St. Germain said he had no first-hand recollection of the plan of corrections letter sent by Mr. Laughlin or meeting with Mr. Laughlin. He verified that a plan of corrections letter is the usual response to notice of fire code violations and that such letters are typically followed up with a phone call or meeting to discuss the plan to remedy the violations. Mr. St. Germain explained that, procedurally, if a cited party contacts NOFD within the required 30 days, the department works with the owner to resolve the violations. If a response is not received within 30 days or no progress is made on corrective actions, the matter is referred to the City Attorney's Office for an adjudication hearing. In this instance, Mr. St. Germain had no record that the property was ever shut down or that an adjudication hearing was fixed as a result of the 1999 fire code violations. He also identified a NOFD document dated October 1, 1999, signed by a Mr. McLemore, a co-worker, who remarked, "See no current file on the facility." Mr. St. Germain acknowledged NOFD's discretionary authority to permit compliance with the safety codes in effect at the time the building went into service to older, historic properties, such as the instant property, rather than mandate compliance with the most current safety codes.

In addressing why Creole Gardens, in 2001, could have been assessed with similar violations cited in the 1999 inspection report, Mr. St. Germain explained that once Creole Gardens was denied an occupational license and shut down for

15

beginning renovations without a building permit, the property had to comply with the most recent, stricter safety codes.

Determining whether a redhbitory vice and knowledge of a redhibitory defect exist is a question of fact for the district court. *See Rodriquez v. Chrysler Group, LLC.*, 2011-524 (La. App. 3 Cir. 11/2/11), 76 So.3d 1279, 1282 (citations omitted). In waiver of warranty sales permitted by La. C.C. art. 2548, a buyer is required to prove fraud in order to vitiate waiver of the warranty against redhibitory defects permitted by La. C.C. art. 2548. *See Shelton v. Standard/700 Associates*, 2001-0587, p. 4 (La. 10/16/01), 798 So.2d 60, 64. The three elements of a fraud claim against a party to a contract include: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract. *Shelton*, 2001-0587, p. 5, 798 So.2d at 64. A district court's determination of fraud or lack thereof is also a question of fact that will not be disturbed on appeal absent manifest error. *See Mirada v. Gonzalez*, 2014-0888, pp. 27-28 (La. App. 4 Cir. 2/4/15), 160 So.3d 998, 1015.

The district court found that Creole Gardens failed to meet its burden of proof to show that the Schreibers made false statements about the existence of fire code violations at the time of sale and/or alternatively, failed to prove the Schreibers knew they made false statements. In support of its findings, the district court cited testimony and evidence submitted from Mr. Laughlin, Mr. St. Germain, and other Dept. of S&P and NOFD representatives. The district court opined in its reasons for judgment:

Initially, the court finds that plaintiff has not shown by a preponderance of the evidence that defendants made false statements about Life Safety Code violations, much less that defendants knew these statements were false.

Rather, the evidence demonstrated that after receiving notice of the violations in July, 1999, Mr. Schreiber hired Mr. Laughlin. Mr. Laughlin then wrote a letter and met with Mr. St. Germain to resolve the violations. Thereafter, he reported back to Mr. Schreiber that there were no remaining violations. Based upon the information he received from Mr. Laughlin and the fact that there was another inspection in October, 1999 and no further adverse action was taken by the Fire Department, Mr. Schreiber specifically informed plaintiff in the Additional Terms and Conditions Agreement to Purchase and Sell of the only Life Safety issue he though[sic] the buyer may encounter—specifically, that they may need to provide a second means of fire egress for Room 7A.

Furthermore, while the violations listed in the earlier, pre-sale Inspection Report contain many of the same violations listed in the post-sale Inspection Report, Mr. Laughlin and Mr. St. Germain offered explanations as to what had occurred and these explanations comported with the documentary evidence submitted, including the fact that in October, 1999, prior to the sale, Mr. McLemore noted that there was "No current file on this facility."

Plaintiff offered no evidence to refute the above.

Creole Gardens argues the district court improperly relied on the testimony of Mr. Laughlin in reaching its findings that the 1999 fire code violations had been resolved and he had notified the Schreibers of their resolution. Creole Gardens represents that Mr. Laughlin's testimony was not credible, arguing that Mr. Laughlin provided no independent documentation of the corrections and emphasizes that Mr. St. Germain had no first-hand recollection as to whether or not the fire code violations had, in fact, been cured. Creole Gardens further cites its 2001 assessment with similar fire code violations the Schreibers had received in

17

1999.  Creole Gardens maintains this evidence proves fire code violations existed at the time of sale and the Schreibers knew of their existence.[12]

"Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Sassone v. Doe*, 2011-1821, p. 2 (La. App. 4 Cir. 5/21/12), 96 So.3d 1243, 1245.  Appellate courts give great deference to the factfinder's findings as "only the factfinder can be aware of the variations in demeanor and tone of voice that bears so heavily on the listener's understanding and belief in what is said." *Urquhart v. Spencer*, 2017-0069, p. 13 (La. App. 4 Cir. 7/27/17), 224 So.3d 1022, 1031 (citation omitted).  Appellate courts are cautioned not to re-weigh evidence or substitute its own findings for those of the factfinder.  *See Bonin v. Ferrellgas, Inc.*, 2003-3024, p. 7 (La. 7/2/04), 877 So.2d 89, 95.

In the case *sub judice*, the district court acted within its authority to accredit the testimony of Mr. Laughlin and accept the Shreibers' version of events, which was supported by testimony from the Dept. of S&P and NOFD witnesses, along with the testimony of Mr. Glasgow, Creole Gardens' architect.    Upon our review of the record in its entirety and the district court's reasons for judgment, a

---

[12] Creole Gardens also argues a 2004 affidavit from Mr. Schreiber foreclosed the district court's factual findings of no governmental violations and misrepresentations by the Schreibers.  In this affidavit, Creole Gardens asserts Mr. Schreiber makes a judicial admission that only "many," rather than "all," of the 1999 fire code violations were remedied.  After Creole Gardens lodged its appeal, Creole Gardens filed a motion to supplement the appellate record with this affidavit.  This Court, noting that Creole Gardens did not introduce the affidavit into evidence at the trial below, denied the motion to supplement. *See Creole Gardens, LLC v. Klaus-Peter F. Schreiber and Sarah Leonard Schreiber*, 2009-0105 (La. App. 4 Cir. 6/10/19).  As such, we need not consider that argument in this opinion.  However, even if considered, we note that the 2004 affidavit does not conclusively undermine the district court's findings regarding a lack of governmental violations at the time of sale or no misrepresentations made by the Schreibers.  The district court specifically cited testimony that not all of the 1999 fire code violations necessarily required correction, as certain violations were not violations under the safety codes in effect when the building went into service.  The district court also referenced the Purchase Agreement, which notified Creole Gardens of a potential fire code violation where it might "need to provide a second means of fire egress for Room 7A."

reasonable factual basis exists for the district court's findings that no fire code violations existed at the time of sale, and the Schreibers did not make knowing fraudulent misrepresentations to Creole Gardens. As these findings were not manifestly erroneous or clearly wrong, we find no merit to this assignment of error.[13]

## CONCLUSION

Creole Gardens had the burden to prove a redhibitory defect existed at the time of sale and that the Schreibers knowingly failed to disclose this defect. The district court not only found that the Schreibers did not make a false warranty about the existence of fire code violations at the time of sale, but also that they did not make any knowing misrepresentations—necessary elements to recover when the warranty against redhibitory defects has been waived. Our review finds no error in these findings. Accordingly, based on the foregoing reasons, we affirm the judgment.

**AFFIRMED**

---

[13] Other erroneous factual findings Creole Gardens contends the district court reached include the district court's alleged mischaracterization of the testimony of its architect, Mr. Glasgow, regarding the causal connection between the 1999 fire code violations and Creole Gardens' costs arising out of the Dept. of S&P's stop work order and the 2001 fire code violations and the district court's finding that Creole Gardens' inspections did not meet due diligence requirements. However, inasmuch as this Court has found the district court did not err in concluding that a redhibitory defect did not exist at the time of sale and that the Schreibers did not knowingly misrepresent the existence of a redhibitory defect, these alleged errors are immaterial and moot. For similar reasons, the district court's findings of no redhibtory defect and no fraudulent misrepresentation by the Schreibers also pretermit discussion and render moot Creole Gardens' claim of detrimental reliance.