# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-95

**STATE OF LOUISIANA**

**VERSUS**

**JOHN RANDAL EAKINS**

\*\*\*\*\*\*\*\*\*\*

ON APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 338,937
HONORABLE LOWELL C. HAZEL, JUDGE

\*\*\*\*\*\*\*\*\*\*

**JONATHAN W. PERRY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Jonathan W. Perry, and Gary J. Ortego, Judges.

**CONVICTIONS AND SENTENCES AFFIRMED;**
**REMANDED WITH INSTRUCTIONS.**

Robert S., Noel, II
Attorney at Law
4106 Desiard
Monroe, Louisiana 71203
(318) 537-9759
**COUNSEL FOR DEFENDANT-APPELLANT:**
    John Randal Eakins

Jeff Landry
Attorney General
Christopher N. Walters
Grant L. Willis
Assistant Attorneys General
Louisiana Department of Justice
Criminal Division
P. O. Box 94005
Baton Rouge, Louisiana 70804-9005
(225) 326-6200
**COUNSEL FOR APPELLEE**:
    State of Louisiana

**PERRY, Judge.**

The issues presented in this criminal case, one that concerns multiple counts of pornography involving juveniles under the age of thirteen, are whether there was sufficient evidence to support the conviction and whether the trial court abused its discretion in making various evidentiary rulings.

## PROCEDURAL HISTORY

On June 12, 2018, the State of Louisiana ("State") charged John Randal Eakins ("Defendant") by bill of information with thirty counts of pornography involving juveniles under the age of thirteen, a violation of La.R.S. 14:81.1. Although Defendant filed numerous pre-trial motions, two motions in limine, outlined below, are pertinent to this appeal.

On October 11, 2019, Defendant filed a Motion in Limine preventing the State of Louisiana and Law Enforcement Officers from remarking on the accused invoking his constitutional rights. In that motion, Defendant contended that "any evidence, commentary, and/or testimony" regarding his invocation of his rights to remain silent and to counsel would be a violation of his rights protected by Article 1, § 13 of the Louisiana Constitution. On October 27, 2021, the trial court granted the motion.

Later, on September 23, 2021, Defendant filed a Motion in Limine for Pretrial Determination of Opinion Testimony, & Motion in Limine Pursuant to La.Code Evid. arts. 701 and 602; this motion was directed to the purported opinion testimony of April Lucia ("Agent Lucia"),[1] a Special Agent of the Louisiana Attorney General's Office, Cyber Crime Unit.

---

[1] The record shows that on October 29, 2019, Defendant also filed a pleading entitled "Motion in Limine for Pretrial Determination of Expert Testimony, Motion in Limine pursuant to La. Code Evid. Art. 702 and 703, 404[,] Motion in Limine, Motion to Strike Pursuant to La. Code Evid. Art. 704, & Daubert Motion (Re: Special Agent Lucia)." The purpose of this pleading was to prevent the State from calling Agent Lucia as an expert witness or from giving an expert opinion

On October 27, 2021, the trial court granted Defendant's motion in limine preventing the State's witnesses from remarking on Defendant's invocation of his right to remain silent. At that same hearing, the trial court denied Defendant's motion in limine regarding Agent Lucia's expected opinion testimony at trial. After Defendant filed an application for writ of review regarding the ruling on Agent Lucia's testimony, this court denied the writ, stating in part:

> Defense counsel contends the trial court erred in refusing to restrict admissibility of possible rebuttal evidence that the State may seek to introduce in response to a defense Defendant intends to employ at trial. This court finds that any determination of the admissibility of the evidence in contention would be premature at this time.

*State of Louisiana v. Eakins*, 21-728 (La.App. 3 Cir. 8/3/22) (unpublished opinion).

Thereafter, on August 17, 2022, just before Defendant's trial began, the State amended the bill of information to delete counts eleven through thirty. Thus, the Defendant proceeded to trial on ten counts of pornography involving juveniles under the age of thirteen, a violation of La.R.S. 14:81.1.

Trial commenced on August 17, 2022, and on August 18, 2022, the jury found Defendant guilty as charged on ten counts of pornography involving juveniles where the victim is under the age of thirteen and the offender is over the age of seventeen.[2] On August 31, 2022, Defendant was ordered to serve ten years at hard labor on each count with all sentences to run concurrently. At that time, Defendant filed a written

during trial. We have combed the record and have not found where this motion was heard, or a ruling made by the trial court.

[2] After carefully reviewing the record, we have been unable to determine whether the jury's verdicts were unanimous because neither the transcript nor the court minutes indicate there was a request to poll the jury or that the jury was, in fact, polled. Because polling is required only if requested by either counsel, no error occurred in the trial court's failure to poll the jury. *See* La.Code Crim.P. art. 812; *State v. Givens*, 403 So.2d 65, 67 (La.1981) (holding that "[i]n the absence of a request by either the state or the defense, the failure of the court to order the jurors polled is therefore not erroneous."). However, we note that at sentencing, the trial court stated Defendant was convicted by a unanimous jury.

motion to reconsider sentence, which the trial court denied in open court. Defendant then perfected this appeal.

## APPELLANT'S ASSIGNMENTS OF ERROR

Defendant has designated three assignments of error: (1) there was insufficient evidence to support his convictions; (2) the trial court erred by allowing Agent Lucia to give an opinion that Erich Salvesen ("Mr. Salvesen") was not the person who downloaded the pornography to Defendant's computer because she believed Mr. Salvesen was gay; and (3) Defendant's right against self-incrimination was violated when law enforcement testified that Defendant terminated an interview and requested his attorney.

## FACTS[3]

This case began when Agent Lucia received a cyber tip from the National Center for Missing and Exploited Children ("NCMEC") about child pornography that Mr. Salvesen sent to Gary Spears ("Mr. Spears") on Facebook. After reviewing the packet of information sent by NCMEC and determining that the files contained child pornography, Agent Lucia secured subpoenas for the internet service provider. Her investigation revealed that the Internet Protocol ("IP") address identified on the flagged files showed that the IP address used for the transmission to Mr. Spears belonged to Defendant at 2015 Jackson Street, Apartment 1, in Alexandria. After compiling the information, Agent Lucia applied for and was granted a warrant to search Defendant's residence for evidence of child pornography.

On April 17, 2018, Agent Lucia and other law enforcement personnel executed the search warrant at Defendant's residence. Agent Lucia testified that Defendant opened the door and then immediately attempted to shut the door when

---

[3] Because the Defendant has raised an issue with the sufficiency of the evidence, we have chosen to provide a more detailed summary of the evidence presented to the jury at trial.

he saw law enforcement. Although the IP address belonged to Defendant, Agent Lucia testified her initial focus was on Mr. Salvesen. Agent Lucia stated she provided Defendant with the search warrant, asked him a few security questions, then asked if he knew Mr. Salvesen. Even though Defendant initially said Mr. Salvesen did not live there, Defendant later acknowledged that he knew Mr. Salvesen; at that time, he provided general information to Agent Lucia about where Mr. Salvesen lived. More importantly, Agent Lucia said Defendant did not disclose any information about Mr. Salvesen having access to Defendant's residence, specifically stating that "he doesn't stay [. . .] he doesn't live here." It was also revealed that Defendant's girlfriend, Jennifer Guin ("Ms. Guin"), lived in the apartment and was present when the search warrant was executed.

It was then that Agent Lucia initiated an internet search for Mr. Salvesen's address. After completing her internet search and believing she now had a good address for Mr. Salvesen, Agent Lucia testified that law enforcement remained at Defendant's residence while Agent Lucia obtained a search warrant for Mr. Salvesen's address. She confirmed that she electronically submitted a search warrant application for Mr. Salvesen's residence, and the warrant was granted. That warrant was for 914 Stracener Street in Alexandria, Louisiana. Agent Lucia testified it was less than a ten minute drive from Defendant's home to Mr. Salvesen's residence. Although she believed there were between eight and ten officers at Defendant's residence, Agent Lucia noted there were three other members of the cyber crime unit present: Special Agents Preston Bennett ("Agent Bennett"),[4] David Pharis, and Randal Gohn.

---

[4] At trial, Agent Bennett testified that he was no longer employed as a Special Agent with the Louisiana Attorney General's Office, and his primary employment was in the private sector. For clarity, ease of reference, and consistency, we have nevertheless chosen to refer to him as Agent Bennett.

After confirming the address for Mr. Salvesen, Agent Lucia left Agent Bennett and a sheriff's deputy with Defendant and his girlfriend while the rest of the team proceeded to Mr. Salvesen's address. In executing the search warrant, Agent Lucia had direct contact with Mr. Salvesen and located child pornography on his desktop computer and a couple of mobile devices.[5] Agent Lucia gave the following description of the pornography found on Mr. Salvesen's computer, "So, Mr. Salvesen, I knew from Facebook messages that Mr. Salvesen indicated he was homosexual, that he was interested in boys, he stated that in messages, skinny little boys about 11 to 16. And that was by and large the only thing he had. It was all young boys." Discussing her experience, Agent Lucia testified that "if you have a certain person who is particularly aroused by a certain genre of pornography, a certain genre of child pornography and that's what they have, that's what they collect, it is highly unusual for them to deviate from that and to go into a completely different genre."

Although Agent Lucia did not give Agent Bennett specific instructions about what to do in her absence, she assumed he would process the electronic devices at Defendant's home because the packet sent to her from NCMEC showed someone had transmitted child pornography from his residence. During Agent Lucia's absence, Agent Bennett conducted an in-field forensic examination of the electronic devices found in Defendant's residence. Upon searching Defendant's personal desktop computer, Agent Bennett found hundreds of images and videos which depicted juvenile, prepubescent female children, younger than thirte, being

_____

[5] Agent Lucia arrested Mr. Salvesen. On October 30, 2018, Mr. Salvesen pleaded guilty to multiple counts of possession of child pornography. The trial court sentenced him as follows:

So, for 100 counts of Pornography with, involving Juveniles, on each count I am sentencing you to 10 years at hard labor and to run concurrent with each other and I am suspending 3 years. Okay, so you will serve 7. Ordering you to pay a fine of $1,000.00 plus court costs.

sexually abused and exploited and having their genitalia lewdly exhibited.[6]  These images and videos were stored in specific folders associated with Defendant.

While she was executing the search warrant at Mr. Salvesen's residence, Agent Lucia noted that she received a call from Agent Bennett midway through her interview with Mr. Salvesen.  When Agent Lucia shared that information with Mr. Salvesen, he told Agent Lucia that he had no idea there was any child pornography on Defendant's computer and stated he and Defendant had never discussed child pornography.  Agent Lucia testified that she believed Mr. Salvesen, noting that people typically do not bring up the subject of child pornography unless they already know the other person is into it.  While the pornography recovered from Mr. Salvesen's residence depicted virtually all young boys, Agent Lucia gave the following description of the evidence recovered from Defendant's computer:

> So, the child pornography that [Defendant] had was all females. It was prepubescent females between the approximately [sic] ages of 6 and 12.  They were engaged in sexual activity, oral, vaginal, rape, as well as just posed in a manner in which they're [sic] genitalia was lewdly exhibited.  So, he had a plethora of different styles, so to speak, but it was all prepubescent females.

Agent Lucia stated on cross-examination that the original tip from NCMEC indicated Mr. Salvesen was receiving child pornography from someone identified as Mr. Spears.  She testified she initially thought Mr. Salvesen may have lived with Defendant based upon Mr. Salvesen's extensive use of Defendant's internet.  She also testified that she did not know whose name was on the lease for 2015 Jackson Street when she applied for the search warrant, only that Defendant lived there and had an internet account there.

---

[6] Because Defendant has neither contested the description of these images and videos nor the age of the children depicted, we have not reviewed them.

Agent Lucia testified that when she interviewed Mr. Salvesen, he initially denied having viewed child pornography. Eventually, Mr. Salvesen acknowledged receiving child pornography from Mr. Spears. She acknowledged that, throughout the interview, Mr. Salvesen was deceptive regarding his contact with Mr. Spears, claiming to have reported him to Facebook and claiming he had not spoken to him in years.

To combat Agent Lucia's testimony that she did not believe the pornography on Defendant's computer was downloaded by Mr. Salvesen, defense counsel attempted to get Agent Lucia to say Mr. Salvesen was bisexual. Agent Lucia maintained that despite Mr. Salvesen saying he would have sex with anyone, his online Facebook messages indicated he preferred boys, and he told users that "he's into skinny little white boys between . . . 11 and 16." Agent Lucia further stated that the child pornography found on Mr. Salvesen's computer was almost exclusively of teenage boys, and in Mr. Salvesen's interview with her, he stated that he was "most attracted to boys age[d] 14 and 15." According to Agent Lucia, Mr. Salvesen told her that he and Defendant had never traded or discussed child pornography.[7]

The State then called former Agent Bennett, who testified he was currently working for a crime scene and bioremediation company, was commissioned as a detective for the Tangipahoa Parish Sheriff's Office and was a Captain in the French Settlement Police Department. Agent Bennett testified he had been working in the law enforcement field for a little over fifteen years. Agent Bennett stated that from 2016 until 2020 he was employed by the Louisiana Department of Justice, Cyber Crime Unit, as a special agent investigating internet crimes against children. He

---

[7] Though not pertinent to the charges brought against Defendant, Agent Lucia testified there was nothing in the investigation to indicate either Defendant or Mr. Salvesen had a hand in the production of the images and videos found on their computers.

noted he had the same title and responsibilities as Agent Lucia. He testified Agent Lucia was the case agent in this investigation, she obtained the search warrants, and his role was strictly to provide support during the execution of the search warrant at Defendant's residence.

According to Agent Bennett, the cyber crime team typically executed its warrants early in the day, usually before 10:00 a.m. He noted this was intended to minimize the potential risk of confronting someone dangerous. Agent Bennett testified that he recalled that there was a desktop computer in the living room of Defendant's home that was turned on when they arrived. He stated that he attached a "wiggler" to Defendant's computer; this attachment vibrated and prevented the computer from going into sleep mode.

Agent Bennett testified that once it became clear Mr. Salvesen did not live at Defendant's residence, he and a local law enforcement officer remained at Defendant's while the rest of the team members moved to the new location where they believed Mr. Salvesen was residing. Agent Bennett noted that it had already been decided that, while the others sought Mr. Salvesen, he would "do some preliminary forensics on the devices located in the residence just to rule out Mr. Eakins as a suspect."

Agent Bennett stated that he inserted a USB drive with the OSForensics program into the computer which was set up in the living room of Defendant's apartment. According to Agent Bennett, the forensics software that he used on Defendant's computer would prevent any data from being written or changed so that the contents could be viewed without the risk of altering or deleting anything. After informing Defendant of his rights and having him sign a waiver of rights form, Agent Bennett was conversing with Defendant, who seemed forthright, when he found some child exploitation material and a "Mega" account. Based on his experience,

8

Agent Bennett testified agents typically see "Mega" accounts "when someone has a multitude of electronic material that they don't want anybody to find," although he noted it was not always child pornography. According to Agent Bennett, Mega's location in New Zealand meant the company was essentially free to ignore requests from the U.S. government to disclose customer information. Agent Bennett testified:

> Through further investigation on . . . the computer I located a lot of child exploitation material, videos and still images of prepubescent females either posed with a clear focus on -- of their genitals as the clear focus of the camera or engaged in some type of sexual act and/or being raped.

Agent Bennett noted that when he began viewing images on Defendant's computer, he intentionally asked Defendant to sit where he could not see the computer screen. According to Agent Bennett, this permitted him to continue talking with Defendant after he found exploitation material. Agent Bennett stated he spent about an hour and a half searching Defendant's computer, noting the software pulled every file that could be a picture or video, even if the file was not saved with a file extension typically associated with a picture or video. He again noted that he was surprised by how much Child Sexual Exploitation Material ("CSEM") was found on Defendant's computer given that the cyber crime team was initially investigating someone else who happened to have used the internet at the residence.

According to Agent Bennett, when he asked Defendant about having a "Mega" account, Defendant terminated the interview. Prior to that, Agent Bennett recalled Defendant telling him that he had seen CSEM but that it was when he had been a kid. Agent Bennett testified that once Agent Lucia returned to the scene and he filled her in on what he had found, she obtained an arrest warrant for Defendant and his computer was seized.

Agent Bennett noted that the computer tower seized in the instant case was homemade, and it was built by someone who knew what they were doing. He specifically noted there were three hard drives, at least one of which was a terabyte hard drive, and the side of the tower had been removed.[8] He noted people typically only remove the side of a tower if they are upgrading or modifying something inside, which takes at least some computer hardware knowledge.

On cross-examination, defense counsel used a transcript of Agent Bennett's conversation with Defendant to show that the "Mega" account was mentioned on the first page of the transcript. Counsel also used the transcript to show that Defendant provided the login information to Agent Bennett before terminating the interview on the seventh page of the transcript to contradict the insinuation that Defendant stopped talking as soon as Agent Bennett asked him about the account. Agent Bennett subsequently noted the information Defendant provided for the "Mega" account was incorrect.

According to Agent Bennett, he was not privy to the exact details of Agent Lucia's cyber tip or the identity of the target of the search warrant. He was only aware they were "executing a search warrant for child sexual exploitation material on a target in Alexandria and the cyber tip was based out of Facebook[.]" It was not until he was on scene that he learned the target individual was not there.

Agent Bennett testified he did not recall needing a password for Defendant's computer as it was active and awake. Agent Bennett noted the computer must have been running some form of Windows as the software he used only worked on Windows, but he was unable to recall which version of Windows it was. He testified he did not remember the exact file path where the exploitation material was located

_____

[8] In closing argument, defense counsel stated that the computer had been provided to Defendant by his employer. Although that contention was made by defense counsel in closing argument, there is no evidence to that effect in the record.

but that he remembered the user account had Defendant's name. He could not recall if it was the only user account on the computer.

Agent Bennett testified that the preview he created with OSForensics remains with the Attorney General's office because it contained the CSEM and that the preview was a vehicle for obtaining probable cause to arrest and charge; once the preview was completed, Agent Bennett's work was completed since he was not the lead agent on the case. When asked what he did to include or exclude Defendant as the one who possessed the CSEM, Agent Bennett testified that he believed he attempted to ask Defendant about the material, at which point Defendant terminated the interview. While defense counsel continued to ask questions regarding exactly what information Agent Bennett obtained or used to include or exclude Defendant, his girlfriend, or anyone else as a suspect, Agent Bennett summarized:

> My testimony is, what I did was, I went [and] found the child exploitation material in an account on the computer underneath [Defendant's] name, when I asked -- when I asked him to explain it[,] he terminated the interview. I provided all that information to Special Agent Lucia and from my understanding she supplied that information to a sitting Judge who issued an arrest warrant based on it.

Agent Bennett did not recall whether he told Defendant he could see from where the CSEM was downloaded, whether there was any indication if the material was transferred to the computer or downloaded via the internet, or exactly when the files were put on the computer.

After seizing Defendant's desktop computer and removing it from the residence, it was provided to Special Agent Brett Labauve ("Agent Labauve"), a computer forensics examiner with the Cyber Crime Unit of the Attorney General's Office. Agent Labauve used a program known as Encase to thoroughly examine Defendant's computer. He also used a "write-blocker" to prevent any changes from being made to Defendant's computer while he examined it. Agent Labauve noted

11

the computer examined in this case was a homemade tower with three hard drives in it, again noting computers purchased from retailers typically do not have three hard drives in them.

According to Agent Labauve, the first two hard drives examined from Defendant's computer did not contain any CSEM. He stated the third hard drive appeared to be purely a storage drive, as the operating system was located on the second hard drive. He noted that Encase showed the user account named John[9] was password-protected. He also noted all the CSEM found on the computer was stored in a folder titled "WinGlue," which he noted was a "Windows text interpreter for some adventure game." He later clarified "WinGlue" was a computer application, and he would have expected the folder to contain "WinGlue"-related program files instead of image or video files. He noted that, under the "WinGlue" folder, there was a "New Folder" whose creation date was about a year later than all the other files saved within the "WinGlue" folder. He noted this folder stuck out because the "WinGlue" program itself would not create a folder named "New Folder" but would have given the folder a name associated with the actual application.

Agent Labauve observed that within the "New Folder" there were subfolders with names indicative of child pornography, names which he recognized from training conferences and experience. As an example, he noted one of the folders was named "PTHC," an acronym used to represent "preteen hard core" in the child pornography world. According to Agent Labauve, the subfolders he found to be child-related had creation dates ranging from December of 2015 until March of 2017. He concluded that 304 contraband image files were found on Defendant's computer in addition to over 111 video files. Additionally, Agent Labauve noted

---

[9] We note it was never established in the record whether the "John" account was the sole account on the computer or simply the account under which the CSEM was saved.

there were over fifteen hundred files that he described as "child erotica" which did not technically qualify as child pornography.

Defendant called two witnesses to testify, his girlfriend, Ms. Guin, and Ms. Guin's mother, Caroline Guin ("Mrs. Guin"). These witnesses were relied upon by Defendant to let the jury hear that Mr. Salvesen had a key to the apartment shared by Defendant and Ms. Guin. These two witnesses were also used to speak about the three-day Christmas 2015 vacation and a day trip to Lafayette for Valentine's Day 2018—both dates Defendant contended that pornography was downloaded on his computer when he was not present.

Defendant's girlfriend, Ms. Guin, testified that Defendant moved from Texas to live with her in Alexandria just before November 2015. She testified that she introduced Defendant to Mr. Salvesen, someone she had known for several years. She made this introduction because Defendant had no friends in Alexandria when he first moved there, and she knew both Mr. Salvesen and Defendant had a common interest—video games. After Mr. Salvesen and Defendant became better acquainted, he was given a key to their apartment; this allowed him access to the apartment to feed their cat when they traveled to Texas to visit Defendant's family or when they visited with Mrs. Guin, who lived in Elmer about thirty-five to forty minutes away. They also allowed Mr. Salvesen to wash his clothes at their apartment. On one occasion when she and Defendant were visiting in Texas, Ms. Guin said that Mr. Salvesen got permission to "crash" at their apartment because he was inebriated and did not think it was wise to drive to his apartment; the futon he would have used was in the room where Defendant kept his desktop computer. She testified that no passcode was needed for Mr. Salvesen to access Defendant's computer.

13

According to Ms. Guin, she and Defendant spent Christmas of 2015 with her mother in Elmer, Louisiana, arriving on Christmas day and returning home on the afternoon of December 28, 2015. During that time, Defendant never returned to their Alexandria apartment.

Ms. Guin also testified that, over time, she and Defendant began to become uncomfortable around Mr. Salvesen because he "started leaning a little bit more towards extreme racism." She testified she and Defendant began to distance themselves from Mr. Salvesen in January of 2018. According to Ms. Guin, she and Defendant went to Lafayette on Valentine's Day in 2018; on that occasion she and Defendant were gone between roughly 5:00 p.m. and midnight. Later, she learned Mr. Salvesen was at their apartment while they were gone, and he was downloading child pornography.

Ms. Guin asserted that if pornography was downloaded on Defendant's computer at either Christmas of 2015 or Valentine's Day in 2018, neither she nor Defendant would have been present at the apartment.

The State cross-examined Ms. Guin. When questioned on cross-examination about why someone, particularly Mr. Salvesen, would leave a personal stash of child pornography on Defendant's computer, she stated she assumed it was convenience, asking, "Would you want to do it at your house?"

Although various other areas were touched upon, Ms. Guin provided information about Defendant's employment between 2015 and 2018. She testified that during that time, Defendant was first a member of the Geek Squad at Best Buy and later he worked for Microsoft. Without elaboration, Ms. Guin said that Defendant provided customer service when he was on the Geek Squad; when pressed further, Ms. Guin denied that Defendant worked in technical IT repair or software maintenance.

14

Mrs. Guin provided information that showed her daughter and Defendant met online approximately twenty years ago; at that time, Ms. Guin and Defendant were in their late teens. Other than providing general, positive information about Defendant's character, Mrs. Guin confirmed her daughter's testimony that she and Defendant were not at the apartment for a three-day period for Christmas in 2015 and later a one-day trip to Lafayette for Valentine's Day in 2018.

## APPELLANT'S ARGUMENT: SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, Defendant contends the State failed to provide sufficient evidence to support his convictions. Specifically, Defendant asserts the State failed to disprove his reasonable hypothesis of innocence that Mr. Salvesen, who had a key to Defendant's apartment, pled guilty to possession of child pornography, and was the initial target of the search warrant, downloaded and hid all the child pornography found on Defendant's computer.

## APPELLEE'S POSITION

The State contends that Defendant's challenge to the sufficiency of the evidence relies solely on his argument, improperly rejecting the jury's credibility determinations in favor of his own one-sided narrative that the jury obviously and correctly rejected when it found Defendant guilty of the charges.

## ANALYSIS

The analysis for insufficient evidence claims is well settled. In *State v. Dorsey*, 10-0216, pp. 42-43 (La. 9/7/11), 74 So.3d 603, 633, *cert. denied*, 566 U.S. 930, 132 S.Ct. 1859 (2012), the supreme court stated:

> When an appellate court reviews a sufficiency of the evidence claim, the standard applied is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). This standard has been codified by our legislature in

Louisiana Code of Criminal Procedure article 821, which provides: "A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." When circumstantial evidence is used to prove the commission of the offense, Louisiana Revised Statute § 15:438 mandates, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Neal*, 00–0674, p. 9 (La.6/29/01); 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). This is not a separate test that applies instead of a sufficiency of the evidence test when circumstantial evidence forms the basis of the conviction. *State v. Cummings*, 95–1377, p. 4 (La.2/28/96); 668 So.2d 1132, 1134. Rather, all of the evidence, both direct and circumstantial, must be sufficient under *Jackson* to convince a rational juror the defendant is guilty beyond a reasonable doubt. It is not the function of the appellate court to assess credibility or reweigh the evidence. *Id.*

Louisiana Revised Statutes 14:81.1(A)(1) provides: "It shall be unlawful for a person to produce, promote, advertise, distribute, possess, or possess with the intent to distribute pornography involving juveniles." Additionally, in *State v. Cinel*, 94-0942, p. 9 (La. 11/30/94), 646 So.2d 309, 316, the supreme court stated:

> [T]he intent required to convict under this subsection is general criminal intent to possess materials depicting sexual performances involving a person or persons under the age of 17, and knowledge that one or more of the performers involved in the materials was under the age of 17 when the materials were made.

"General criminal intent is present when the circumstances of the crime indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La.R.S. 14:10(2).

Defendant's argument regarding sufficiency of the evidence is that the State failed to prove he had the necessary general criminal intent to possess the pornography involving juveniles which was found on his computer because it did not disprove the rational hypothesis that his friend Mr. Salvesen downloaded the pornography and hid it on Defendant's computer. This is the exact argument Defendant presented to the jury at trial.

16

Based on testimony presented during the trial, there is no question that Mr. Salvesen possessed pornography involving juveniles. Additionally, on at least one occasion, Mr. Salvesen had used the internet at Defendant's residence to obtain child pornography, as the original NCMEC tip involved Mr. Salvesen's use of Facebook Messenger to trade child pornography while his computer was using Defendant's IP address. Accordingly, we acknowledge that Defendant's claim is a rational hypothesis. However, as shown below, the jury was presented with evidence that it could reasonably dismiss the hypothesis that the pornography found on Defendant's computer belonged to Mr. Salvesen.

As noted by Agent Lucia, the pornography found on devices at Mr. Salvesen's residence all featured juvenile males. Additionally, Mr. Salvesen's Facebook messages made it clear he was seeking child pornography involving "skinny little boys about 11 to 16." In stark contrast, the child pornography located on Defendant's computer featured prepubescent females. According to Agent Lucia, it is highly unusual for someone with such a specific preference, such as Mr. Salvesen's interest in young boys, to download and keep large quantities of pornography with a completely different focus.

Moreover, we observe the level of computer sophistication involved in the two men's computers supports the jury's conclusion the contraband on Defendant's computer was his, not Mr. Salvesen's. Mr. Salvesen sought and obtained child pornography via Facebook. In stark contrast, Defendant's computer had a "Mega" account that functioned to hide the user's activity and prevent outside parties from monitoring it; additionally, all the pornography found on Defendant's computer was manually hidden in subfolders within a program folder on the computer. That placement would prevent a casual search from locating it because the video and image files would not show unless the search was expanded to include program files.

17

Finally, Defendant's computer was custom built, and Ms. Guin testified Defendant held two jobs while he was living with her: he worked for Best Buy's technical support group, the Geek Squad, and he later worked for Microsoft.

Viewing all the above evidence in the light most favorable to the State, we conclude that it was reasonable for the jury to reject Defendant's hypothesis that Mr. Salvesen downloaded and then hid pornography involving juveniles on Defendant's computer. Accordingly, we find this assignment of error lacks merit.

## APPELLANT'S ARGUMENT: AGENT LUCIA'S OPINION TESTIMONY

In his second assignment of error, Defendant contends the trial court erred in allowing Agent Lucia to give her opinion that Mr. Salvesen was gay and, therefore, unlikely to have downloaded the large quantity of pornography involving prepubescent females found hidden on his desktop computer.

In making this assertion, Defendant acknowledges that defense counsel did not make a contemporaneous objection to Agent Lucia's testimony during trial. However, Defendant points out that on September 23, 2021, Defendant filed a motion entitled "Motion in Limine for Pretrial Determination of Opinion Testimony, Motion in Limine Pursuant to La. Code Evid. Art. 701 and 602." This motion addressed the opinion testimony of Agent Lucia and sought a ruling from the trial court "to assess whether the State's purported evidence and proposed testimony of April Lucia comports with La. Code Evid. Arts. 701 and 602."

Thus, Defendant counters that his pre-trial filed motion in limine properly preserved his argument to this court even if defense counsel did not object to Agent Lucia's testimony at trial.

## APPELLEE'S POSITION

The State, relying on La.Code Crim.P. art. 841, contends Defendant waived his right to seek review of this ruling by failing to lodge a contemporaneous

18

objection to Agent Lucia's testimony regarding Mr. Salvesen's demonstrated preference in pornography which involved young boys. However, assuming Defendant has properly preserved his evidentiary challenge, the State asserts that Agent Lucia testified about her personal description of the evidence and the contents of Mr. Salvesen's collection of child pornography. Moreover, it contends that Agent Lucia was permitted to testify to matters within her personal knowledge acquired through her experience as a law enforcement officer.

## ANALYSIS

Louisiana Code of Criminal Procedure Article 841 states:

> A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
>
> B. The requirement of an objection shall not apply to the court's ruling on any written motion.
>
> C. The necessity for and specificity of evidentiary objections are governed by the Louisiana Code of Evidence.

In *State v. Henry*, 19-65, p. 43 (La.App. 3 Cir. 12/18/19), 287 So.3d 847, 874–75, this court stated:

> The purpose of the contemporaneous objection rule is twofold: (1) to put the trial judge on notice of any alleged irregularity so that he may immediately cure the problem and (2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by timely objection and request for an admonition or mistrial.

Although there was no objection at trial to Agent Lucia's testimony, Defendant raised his objection to admissibility in a pretrial written motion which the trial court denied. In *State v. Parker*, 421 So.2d 834, 840, (La.1982), *cert. denied*, 460 U.S. 1044, 103 S.Ct. 1443 (1983), our supreme court stated, "Although defense counsel did not object contemporaneously to the testimony of the two [state

19

troopers], the defendant filed prior to trial a 'Motion to Exclude Evidence Concerning Defendant's Arrest in Raceland and the events leading up to it,' the court's denial of which is sufficient to preserve this issue for review." Based upon *Parker*, we find that Defendant may raise the issue of admissibility again on appeal. *See also State v. Schmidt*, 99-1412 p. 39 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, 152, *writ denied*, 00-2950 (La. 9/28/01), 798 So.2d 105 (holding that "[a]lthough there was no objection at trial [to the admissibility of a DNA study and the conclusions of the DNA test,] Defendant raised his objection to admissibility in a pretrial written motion and, thus, he may raise the issue of admissibility again on appeal.")

Louisiana Code of Evidence Article 602 provides:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This Article is subject to the provisions of Article 703, relating to opinion testimony by expert witnesses.

Nevertheless, we observe that Defendant's argument is based upon Agent Lucia's testimony not meeting the requirements for expert testimony under La.Code Evid. art. 702 and *Commonwealth Ins. Co. v. Halliburton Energy Servs., Inc.*, 03-2490 (La.App. 1 Cir. 12/30/04), 899 So.2d 24, *writ denied*, 05-300 (La. 5/6/05), 901 So.2d 1095. Under La.Code Evid. art. 702(A):

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based on sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

Additionally, "[t]here are three intertwined bases for excluding testimony under art. 702: (1) if the testimony will not assist the trier of fact; (2) if scientific evidence is not sufficiently reliable; and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors." *Commonwealth*, 899 So.2d at 30.

It is well-established in Louisiana that law enforcement officers are permitted to testify about matters within their personal knowledge acquired through their experience. *See State v. Griffin*, 16-424 (La.App. 3 Cir. 4/19/17), 217 So.3d 484, *writ denied*, 17-1027 (La. 3/2/18), 269 So.2d 708. In the present case, the record shows that Agent Lucia had been in law enforcement since 2008, had worked cases involving sex offenders for most of her career, and had a "Master's degree from Texas A&M University in Applied Criminology with a Focus on Sex Offender Behavior." Although the State did not call Agent Lucia as an expert witness in this case, the record clearly shows her testimony was based upon her experience working cases involving child pornography.

Additionally, the testimony the Defendant complains of is not Agent Lucia's opinion. To the contrary, the record shows that when Agent Lucia asserted that Mr. Salvesen was gay, she was reading his words from his Facebook messages that stated that he was homosexual and that he was only interested in "skinny little boys about 11- 16." The pornography collection found on Mr. Salvesen's computer, which depicted almost all young boys, conforms to his stated interest on Facebook. Clearly, Agent Lucia's testimony was given in the context of this case and had a firm foundation based on the evidence. Because Agent Lucia was not an expert witness, her testimony does not have to meet the requirements set forth in La.Code Evid. art. 702. Accordingly, we find Defendant's assignment of error lacks merit.

## APPELLANT'S ARGUMENT: STATE'S WITNESSES WHO REFERENCED DEFENDANT'S RIGHT TO REMAIN SILENT

In his third assignment of error, Defendant contends that despite a pre-trial ruling on his motion in limine that the State's witnesses could not reference Defendant's invocation of his right to remain silent, his constitutional rights were violated when Agent Lucia and Agent Bennett both referenced the fact that Defendant invoked his right to remain silent while being interviewed the day he was arrested.

### APPELLEE'S POSITION

The State, relying on La.Code Crim.P. art. 841, contends Defendant waived his right to seek review of this ruling by failing to lodge a contemporaneous objection to Agent Lucia's testimony regarding Mr. Salvesen's demonstrated preference in pornography involving young boys. However, assuming Defendant has properly preserved his evidentiary challenge, the State contends that any line of questioning which referenced Defendant's silence was not designed to exploit the Defendant's invocation of his constitutional right to remain silent.

### ANALYSIS

On October 11, 2019, Defendant filed a "Motion in Limine Preventing the State of Louisiana and Law Enforcement Officers from Remarking on the Accused Invoking his Constitutional Rights & With Incorporated Memorandum in Support Thereof." In that pleading, Defendant contended:

> It is anticipated the State of Louisiana and/or its law enforcement officers will offer evidence, commentary and/or testimony of the Accused exercising his constitutional rights. It would be improper for this Court to allow any such evidence, commentary, and/or testimony" as it would be a violation of the Accused's right to silence and right to counsel protected by Article I, Section 13 of the Louisiana Constitution; *Doyle v. Ohio*, 426 U.S. 610, (1976), *Miranda v. Arizona*, 384 U.S. 436 (1966)."

On October 27, 2021, numerous motions in limine were heard, including the motion to prohibit the State or law enforcement from mentioning Defendant's invocation of his rights during his interview. Unfortunately, our review of the record shows it only contains the portion of the hearing that is related to the testimony of Agent Lucia, which we discussed in Assignment of Error Number Two. In fact, the only reference to Defendant's motion to prohibit references to his termination of the interview is a minute entry which states, "Defense gives argument in support of the motion. State gives rebuttal argument. Court addresses State and Defense. Court grants the motion." As such, we are unable to determine the actual scope or specifics of the trial court's ruling on the motion.

In the present case, Defendant contends that because there was a pretrial ruling on the issue, he need not have objected at trial to maintain his right to appeal. As previously noted, the record does not contain the transcript of the hearing of the motion in question. At no time did Defendant seek to have the record supplemented with this transcript, and it is therefore impossible for this court to even state with absolute certainty that the references in question violated the court's pretrial ruling. Notwithstanding the inadequacy of the record, we will nonetheless address Defendant's argument.

This court has previously addressed a similar issue in *State v. Dalcourt*, 11-1238 (La.App. 3 Cir. 5/2/12) (unpublished opinion) (2012 WL 1521465), *writ denied*, 12-1253 (La. 11/16/12), 102 So.3d 30. In *Dalcourt*, the defendant argued he was entitled to a mistrial because the detective in charge of the case, during a discussion of his investigation, was asked if he had spoken to the defendant and noted the defendant had refused to provide a statement. This court stated the following:

23

The fifth circuit recently discussed a defendant's post-arrest right to remain silent in *State v. Pierce*, 11-320, pp. 7-8 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267, 1272–73 as follows:

It is well settled that a prosecutor cannot make reference to the fact an accused exercised his constitutional right to remain silent, after he had been advised of the right, solely to ascribe a guilty meaning to his silence or to undermine, by inference, an exculpatory version related by the accused, for the first time at trial. *State v. Olivieri,* 03–563 (La.App. 5 Cir. 10/28/03), 860 So.2d 207, 213. But, the State may pursue a line of questioning that attempts to summarize the extent of the investigation, when such questions are not designed to exploit the defendant's failure to claim his innocence after his arrest in an effort to impeach his testimony or attack his defense. *Id.* An oblique and obscure reference to a defendant's post-arrest silence, where the examination does not stress the right to remain silent or attempt to elicit testimony regarding the defendant's failure to respond to police questioning does not constitute reversible error. *State v. Robinson,* 04–964 (La.App. 5 Cir. 2/15/05), 896 So.2d 1115, 1126.

Under La.C.Cr.P. art. 771, when the prosecutor or a witness makes a reference to a defendant's post-arrest silence, the trial court is required, upon the request of the defendant or the State, to promptly admonish the jury. In such cases where the trial court is satisfied that an admonition is not sufficient to assure the defendant a fair trial, the court may grant a mistrial upon motion of the defendant. *State v. Robinson,* 896 So.2d at 1126, citing *State v. Kersey,* 406 So.2d 555, 559 (La.1981). A brief reference to a defendant's post-arrest silence does not mandate a mistrial or reversal when the trial as a whole was fairly conducted, the proof of guilt is strong, and the prosecution made no use of the silence for impeachment purposes. *Id.*

*Dalcourt*, pp. 4-5.

While Defendant is correct that the references to him "terminating" the interview with Agent Bennett occurred during the State's case in chief, there is no evidence the State sought to exploit Defendant's decision to invoke his right to remain silent or to encourage the jury to assume he was guilty simply because he chose to stop talking to law enforcement. Moreover, we note that much like the

situation in *Dalcourt*, both Agent Lucia and Agent Bennett referenced that Defendant chose to invoke his right to remain silent during their discussions of the steps taken during the investigation. Additionally, during Defendant's cross-examination of Agent Bennett, defense counsel specifically raised the issue of Agent Bennett's communication with Defendant. Initially, he asked Agent Bennett if Defendant had cooperated with him by giving him the login information for Defendant's "Mega" account. In response to defense counsel's questioning, Agent Bennett stated Defendant gave them information, but none of the information was accurate. Then, while attempting to argue the State failed to exclude anyone else as responsible for downloading the child pornography on the computer, defense counsel questioned what Agent Bennett did to determine if Defendant had downloaded the material.

Finally, as noted by the State in its brief, defense counsel addressed the statements made by Defendant to law enforcement prior to his invocation of the right to remain silent. Defense counsel argued in his opening statement that Defendant was helping police find Mr. Salvesen and cooperating with them; however, he fails to mention that Defendant eventually stopped cooperating with the investigation. As previously quoted, Agent Bennett testified that when he asked Defendant about the material, "he terminated the interview." We find that allowing Defendant to promote his initial cooperation with law enforcement, but not allowing law enforcement to make any reference to Defendant ending his cooperation, would be patently unfair and would allow Defendant to give the false impression that he was fully cooperative with law enforcement.

In closing, although Defendant complains that the State's witnesses referred to the invocation of his constitutional right to remain silent, defense counsel on multiple occasions sought to present Defendant as cooperative with law enforcement

25

and promote his communication with them. Simply put, disclosure of Defendant's invocation of his right to remain silent was inevitable once defense counsel, as early as in his opening statement to the jury, decided to present Defendant as a cooperative witness who helped law enforcement search through his computer. As such, Defendant's decision to then complain that the issue existed is insincere at best.

Therefore, we find no merit to Defendant's assignment of error.

### ERROR'S PATENT REVIEW

In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record.

Our careful review of the record shows a conflict between the sentencing colloquy and the court minutes. According to the sentencing transcript, the trial court stated the sentences imposed were ten years on each count, and the sentences were ordered to run concurrently with each other. On the other hand, the minutes of sentencing state the following, in pertinent part:

> Court sentenced accused for PORNOGRAPHY W/ JUVENILES. PORNOGRAPHY W/ JUVENILES. PORNOGRAPHY W/ JUVENILES. PORNOGRAPHY W/ JUVENILES. PORNOGRAPHY W/ JUVENILES. PORNOGRAPHY W/ JUVENILES. PORNOGRAPHY W/ JUVENILES. PORNOGRAPHY W/ JUVENILES. PORNOGRAPHY W/ JUVENILES. Court sentenced accused to be committed to the Louisiana Department of Corrections. Accused to serve 010 Year(s). Sentence is to be served at Hard Labor. Sentence is to run concurrent. Sentence to be without benefit of parole. Sentence is to be without benefit of Probation. Sentence is to be without benefit of Suspension of Sentence.

Although the minutes state the name of the offenses for which Defendant was convicted indicating ten convictions, the minutes indicate that a single sentence was pronounced. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, we order the

26

trial court to correct the minutes of sentencing to accurately reflect that the sentence was imposed on "each count."

## CONCLUSION

For the foregoing reasons, Defendant's convictions and sentences are affirmed. The trial court is directed to correct the minutes of sentencing to accurately reflect that the sentence was imposed on "each count."

**CONVICTIONS AND SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.**